JOSHUA C. SANDERS

*v.*

HENRY E. SEELYE *et al.*

*Filed at Ottawa May 16, 1889.*

1. ATTORNEY AT LAW—*attorney's lien.* Attorneys' liens are classed as general (or retaining) liens, and charging (or special) liens. The first attaches to all papers, documents, etc., which the attorney receives professionally; the second only upon that which is recovered through his professional services. This court has held that the latter of these liens does not exist in this State; but the court now holds, that in a proper case an attorney may, in this State, maintain a general or retaining lien.

2. This retaining lien exists on all papers or documents of the client placed in the attorney's hands in his professional character or in the course of his professional employment, and it makes no difference what the purpose may have been in placing them in the attorney's hands.

3. SAME—*lien in favor of different firms.* Where a client knows that an attorney and a firm of attorneys are acting together as his attorneys in a case, and he delivers bonds to either one of them, to be used for his benefit in the litigation, the lien will attach on the bonds for the benefit of them all, for any balance due by him to either firm as fees in the case.

4. SAME—*rule on attorney to surrender papers, etc.* If an attorney does not receive bonds of his client in his professional capacity, but only as a mere custodian, the court has no authority to make an order in some other suit requiring the attorney to show cause why he should not surrender them. The fact that the client files his petition in a suit he has had with others, for a rule on his attorney to surrender and deliver up bonds placed in his hands, is inconsistent with the contention that the holder did not receive them professionally, to be used in such suit.

5. SAME—*contract of employment—in what court.* A party wrote a letter to his attorneys, offering to give them $500 fees for attending to a case in the *Supreme Court.* The case had to go the Appellate Court, and preparation was being made to take the case there. The whole correspondence between the attorneys and client showed that the services contracted for were services in the *Appellate Court:* *Held,* that the court below was justified in finding that the special contract related to the Appellate and not the Supreme Court.

Appeal from the Appellate Court for the First District;— heard in that court on appeal from the Circuit Court of Cook county; the Hon. Murray F. Tuley, Judge, presiding.

Mr. D. T. Corbin, for the appellant:

Attorneys have no lien, in this State, for their professional services, upon a *quantum meruit,* upon railroad bonds of their client involved in litigation conducted by them. *Humphrey* v. *Browning,* 46 Ill. 476; *Forsythe* v. *Beveridge,* 52 id. 268; *LaFramboise* v. *Grow,* 56 id. 202; *Lucas* v. *Campbell,* 88 id. 447; *Nichols* v. *Pool,* 89 id. 491.

When an attorney accepts possession of his clients bonds involved in litigation being conducted by him, with the distinct understanding and agreement that he is to place them in a safe place, and hold the same subject to his client's order, the client is entitled to have such bonds on demand; and such agreement constitutes a waiver of any lien thereon for professional services, even if it otherwise existed. *Darlington* v. *Chamberlain,* 20 Bradw. 443; *Walker* v. *Birk,* 6 D. & E. 258; Overton on Liens, 143; *Firth* v. *Forbes,* 4 DeG., F. & J. 409.

Liens, when they exist, do not attach to papers received by the lawyer in any other than a professional capacity. *Bozen* v. *Bolland,* 4 M. & C. 354; *Wickens* v. *Townsend,* 1 R. & M. 361; *Ex parte Nesbett,* 1 S. & L. 279; 1 Hoffman's Ch. Pr. 35.

If papers are delivered to the lawyer only for a specific purpose, he can have a lien only in respect to such purpose, and not in respect to other transactions. *Lawson* v. *Dickinson,* 8 Mod. 306; *Balch* v. *Syrnes,* 1 Turner, 192.

When attorneys are co-partners when they accept a retainer, the contract of retainer is a joint and continuing one, and neither of the partners can be released from its obligations, either by a dissolution of their firm or by any other act or agreement between themselves. Whatever is done by either in defense of a suit (retained in before dissolution) after dissolution, is done under the contract of retainer which they had

previously made with their client, as much as if they had not dissolved. *Walker* v. *Goodrich*, 16 Ill. 341.

The employment of one of a firm of attorneys is the employment of all. *Eggleston* v. *Boardman*, 27 Mich. 14.

It is the duty of the several members of a law firm retained to attend to legal business, to go on and complete their contract, after dissolution of the partnership, without reference to having entered into a new partnership. *Moshier* v. *Kitchell*, 87 Ill. 18.

The law of principal and agent is generally applicable to that of client and attorney. Wharton's Com. on Agency and Agents, 580.

If the agent does not perform his appropriate duties, or if he is guilty of gross negligence, or gross misconduct, or gross unskillfulness, in the business of his agency, he will not only become liable to his principal for any damages which the latter may sustain thereby, but he will also forfeit his commissions, and in case of a solicitor, will forfeit his fees. Story on Agency, (9th ed.) sec. 331; Mechem on Agency, sec. 832; *Prescott* v. *White*, 18 Bradw. 322; *Sea* v. *Carpenter*, 16 Ohio, 412; *Segar* v. *Parish*, 20 Gratt. 672.

The measure of damages in an action against the attorney is the actual loss sustained as the natural, direct and proximate result of his negligence or default. Mechem on Agency, sec. 835; *Stevens* v. *Walker*, 55 Ill. 151.

At the time of employing an attorney, the party and attorney may agree upon the amount of compensation. When such a contract is fairly made, it is conclusive upon both parties, unless its provisions have been waived. *Stanton* v. *Embrey*, 93 U. S. 548; *Planters' Bank* v. *Hornberger*, 4 Cald. 531; *Bright* v. *Taylor*, 4 Smed. 159; *Tapley* v. *Coffin*, 12 Gray, 420; *Yates* v. *Robertson*, 80 Va. 475; *Badger* v. *Gallaher*, 113 Ill. 662; *Ripley* v. *Bull*, 19 Conn. 56; *Hitchings* v. *VanBrunt*, 38 N. Y. 335; *Broodman* v. *Brown*, 25 Iowa, 449; Mechem on Agency, 843.

Mr. D. J. SCHUYLER, for the appellees:

At common law an attorney has a retaining lien on the papers and documents of his client that come into his hands in the course of his professional employment, and such lien extends to the general balance due him from the client. Story on Agency, sec. 383; Wharton on Agency, sec. 623; Stokes on Attorney's Liens, 1-5; 1 Jones on Liens, secs. 115, 119; Weeks on Attorneys, 607; *Forsythe* v. *Beveridge*, 52 Ill. 270; *Wright* v. *Cobleigh*, 21 N. H. 340; *Dennett* v. *Cutts*, 11 id. 163; *Stephenson* v. *Blacklock*, 1 M. & S. 535; *St. John* v. *Diefendorf*, 12 Wend. 260; *Ex parte Sterling*, 16 Ves. 258.

There are two kinds of liens of attorneys treated of in the authorities, viz.: First, the retaining lien, or the right to retain possession of a client's papers which have gone into the attorney's hands in the course of his professional employment; and second, the charging lien, or the right to charge the client's property which is not in the attorney's possession, with the payment of the debt. Stokes on Attorney's Liens, 1, 2; Story on Agency, sec. 383; Wharton on Agency, secs. 623, 625.

The authorities cited by appellant's counsel to show that attorneys have no lien in Illinois, are all cases concerning the charging lien, and not of the retaining lien. There is a wide distinction to be observed between the retaining lien, which is the right to retain documents of the client in the attorney's possession, and the charging lien, which seeks to charge the fruits of the suit,—for instance, the judgment, or the real estate recovered, or other of the client's property,—with the lien, and which lien does not at all depend upon possession by the attorney. The two liens are entirely different in origin, or grounds on which they are based, and in their nature, extent and mode of enforcement.

Mr. H. E. SEELYE, also for the appellees.

Mr. JUSTICE WILKIN delivered the opinion of the Court:

The case of *Walter L. Peck et al.* v. *Chicago and Great Western Railroad Land Co. et al.* (a statement of which will be found in 112 Ill. 414-430,) having been reversed and remanded by this court, and pending in the circuit court of Cook county, a dispute arose between appellant and appellees, his former attorneys, as to the fees of the latter, and out of that controversy grew the further one as to whether or not appellees were entitled to a lien upon the one hundred and ninety-five bonds of appellant involved in the Peck suit.

Appellant having discharged said attorneys, tendered them $175 in full of all fees due them, and demanded the surrender of the bonds, which being refused, he filed this petition for a rule on them to surrender and deliver up the same to him. Upon being ruled to show cause why they should not be required to do so, respondents set up a retaining lien for fees, which they claim were due and unpaid from petitioner, for services rendered by them in said cause, appellees Quick & Miller claiming $5000 for such services in the Appellate Court for the First District and the Supreme Court, and $500 for services after the reversal and before they were finally discharged. No special claim for fees was made by respondent Seelye, in the answer, but it was averred that he had rendered services in said cause in connection with said Quick & Miller. Before the master he presented an account for professional services performed for appellant, generally, aggregating $3650. The cause having been referred to the master to take and report the evidence, together with his conclusions, he made his first report, by which he found that there was due Quick & Miller $5500, and Seelye $2840, and also reported that they were entitled to a retaining lien upon the bonds for those amounts. On exceptions to this report, the circuit court held that Quick & Miller were only entitled to the sum of $300 for services in the Appellate Court, by the terms of an express agreement

between themselves and Seelye on the one part, and appellant on the other; that in addition to that amount they were entitled to $500 for services performed after the reversal in the Supreme Court. It was also held upon that hearing, that they were entitled to compensation for their services in the Supreme Court upon the *quantum meruit,* there being no contract between the parties as to what should be paid therefor; and the cause was again referred to the master to take evidence, and ascertain the value of such services.

As to that part of the master's report allowing Seelye $2840, no objection was made, because it was not claimed in the answer, but the objection then urged was, that the allowance was greater in amount than the evidence justified, and the court, upon consideration thereof, reduced it to $1205.

On the coming in of the master's second report, by which he found the value of the services of Quick & Miller in the Supreme Court to be $5000, further exceptions were heard, and it was finally determined and ordered that Quick & Miller be allowed the sum $4950, and Seelye $1158.25, and that they each have a retaining lien upon said bonds until said amounts should be paid. Sanders having appealed, appellees filed cross-errors in the Appellate Court, by which they sought to question the correctness of the decree below, in not allowing them the full amounts reported by the master. The Appellate Court having affirmed the decree below, Sanders appeals to this court.

The cross-errors are not insisted upon here, and we have therefore only to consider the grounds of reversal insisted upon by appellant. Numerous errors are assigned on his behalf, each of which is made a point in the argument. Many of them are mere criticisms upon the opinion of the Appellate Court, and are in no proper sense assignments of error on the record.

We think the merits of the case may be fully and fairly considered under three heads, viz: First, has an attorney a

retaining lien in this State, as a matter of law; second, are the facts essential to the existence of such a lien established by the proofs in this case; third, does the evidence justify the decree as to the amounts found due.

Attorney's liens are classed as general (or retaining) liens, and charging (or special) liens. The first attaches to all papers, documents, etc., which he receives professionally; the second only upon that which is recovered through his professional services. This latter right of lien has been denied by this court in several cases. In *Humphrey et al.* v. *Browning et al.* 46 Ill. 476, it was held that he had no lien upon real estate recovered in ejectment; in *Forsythe* v. *Beveridge*, 52 Ill. 268, that he had no such lien upon a judgment recovered; and so in each of the other cases cited by counsel, it was held that no lien existed in his favor upon the subject matter of the suit. Although expressions are used in the opinions in some of these cases which seem to deny an attorney's right to the retaining lien also, in none of them was that question before the court, nor was it decided. It is now therefore to be treated as an open question in this State.

That it is a well established common law right, must be conceded. *Stephen* v. *Blacklock*, 1 M. & S. 535; *St. John* v. *Dufendorf*, 12 Wend. 261; *Bennett* v. *Cetts*, 11 id. 163; *Walker* v. *Sargeant*, 14 Vt. 247; *Ward* v. *Craig*, 87 N. Y. 551. No reason is perceived for denying the existence of that right in this State. There is nothing in our statute which changes the common law relations between attorneys and their clients in such a manner as to affect this right, nor are we able to see wherein this rule of the common law is inapplicable to "the habits and conditions of our society, or contrary to the genius, spirit and objects of our institutions." We therefore hold, that in a proper case an attorney in Illinois may legally maintain such a lien.

Passing to the next question, the authorities seem to be uniform in holding that this retaining lien exists on all papers

or documents of the client placed in the attorney's hands in his professional character or in the course of his professional employment; (Stokes on Liens of Attorneys, p. 67; Weeks on Attorneys, sec. 372, p. 614; Wharton on Agency, sec. 625; Story on Agency, sec. 383;) and it makes no difference what the purpose may have been in placing them in the attorney's hands. Weeks on Attorneys, sec. 372, *supra;* Wharton on Agency, sec. 625, note 1.

Did the bonds in question come into the possession of appellees within the meaning of these rules? It is insisted that they were left with Seelye merely for safe keeping, subject to appellant's orders, and that their deposit with him had no connection with either his or Quick & Miller's professional employment in the *Peck case.* This position is wholly inconsistent with the remedy appellant is now seeking to enforce. If Seelye was a mere custodian of these bonds for safe keeping, and held them only subject to appellant's order, by what authority can the circuit court of Cook county, in the *Peck case,* make an order requiring respondents to show cause why they do not surrender them? We think, however, that the evidence is clear, to the effect that they were placed in the hands of Seelye as the attorney of appellant in the *Peck case,* so that they might be used in securing to the client the benefits resulting to him from the successful litigation of that case in the Supreme Court; and whatever may have been appellant's understanding as to the amount of fees to be paid, it can not be claimed that he did not fully understand that Quick & Miller and Seelye were acting together as his attorneys in that case. Therefore, whether the bonds were delivered to Seelye alone, or to him and Quick & Miller jointly, the lien would attach for the benefit of all. It is also clear, from the evidence, that appellant knew that these bonds had been deposited by Seelye in the safe of Quick & Miller, and that they claimed a lien upon them for their services; and with such knowledge he permitted them to remain in their possession, retaining them

thereafter in the further management of said cause. We are of the opinion, therefore, that the circuit court was justified in holding that said bonds were subject to a lien in favor of appellees for any balance due and unpaid them for their fees as the attorneys of appellant.

That there was a balance of $500 due Quick & Miller is not controverted, and the exceptions filed to the master's report allowing Seelye certain fees, must be held to amount to an admission that there was something, at least, due him. In the exception it is said he should only have been allowed $805, and it was admitted that of that amount but $475 had been paid, but it was attempted to charge him with $160, money and accrued interest furnished to pay taxes, for which it was claimed he had failed to account, thus leaving a balance of $270, and it was sought to liquidate this amount by a counter-claim of $500, for damages resulting from a failure to pay taxes for the appellant, of which there is no satisfactory proof whatever. But the principal question in determining whether fees were due and unpaid, is, whether or not the services performed were under a special contract, and therefore can be more satisfactorily considered under the third head.

The relative positions of the parties on this branch of the case may be thus stated: Appellant maintains that he made a special contract with appellees, by which he was to pay $500 if successful in the Supreme Court, and $300 if unsuccessful, which position can only be maintained by holding, that whatever services were performed in the Appellate Court were understood to be merely preliminary to a final decision in the Supreme Court, the fees to be paid in both being included in the one contract. Appellees insist that whatever special contract was made, was with reference to fees in the Appellate Court alone, and that they are entitled to a reasonable compensation for all other services,—and so the Supreme and Appellate Courts have held.

Appellant's theory is based upon his letter to appellee Seelye, dated September 25, 1882, in which he says : "Yours 23d inst. was received this A. M. In reply I would say, that the terms on which you propose to have my interest represented and protected in *Supreme Court* on appeal, are not so favorable as I was led to anticipate, and I can not accede to them. * * * I will do this : I will pay for the printing necessary in the case, and I will pay attorney's fees in addition to make the sum of $500 if successful, if not successful $300,—that is, the total shall not exceed $500 in case of success, and only $300 if not successful. * * * If the thing is a success I may feel different as to remuneration. I don't want any one to work for me without fair compensation if the result is remunerative to me. My proposal relates to a reversal of the *Supreme Court;* as to other acts succeeding, different terms can be fixed." The construction contended for by appellees, and sustained by the lower courts, makes the letter read as though the words "Appellate Court" had been used instead of "Supreme Court." Seelye testifies that he understood the letter in that way, and we think, from all the evidence, the circuit court was justified in holding that Sanders so intended, notwithstanding the express mention of the Supreme Court therein. This, we think, is manifest from the correspondence between the parties, preceding and subsequent to the foregoing letter.

It is admitted that the *Peck case,* long prior, had been appealed by Sanders to the Supreme Court, and the appeal dismissed. Subsequently, Seelye, and Herbert, Quick & Miller, (the latter firm being the predecessors of the firm of Quick & Miller,) by correspondence with Sanders, had been negotiating with him for the privilege of withdrawing the record from the Supreme Court, for the purpose of prosecuting a writ of error on behalf of other parties. On the 28th day of September, 1881, Seelye informed Sanders, by letter, that they had finally succeeded in getting the record, and asked, "Now what shall

we do?" On October 8, 1881, Herbert, Quick & Miller wrote Seelye: "We now have the transcript in our possession to file in the *Appellate Court.* \* \* \* On this a writ of error should be sued out immediately," etc. On the same day Seelye inclosed that letter to Sanders, and wrote him: "Now that we have the record, it seems important that we move upon the enemy's works with as little delay as possible." Sanders had, at all times prior to this date, declined to be a party to the writ of error; but it is clear, from these letters, that he knew that it was to be sued out of the Appellate Court, and not the Supreme Court.

On the 14th day of August, 1882, appellant wrote Seelye, saying: "I write to inquire if anything was done in the Riverside case, looking to a review in the *Supreme Court.*" September 14 following, Seelye replied: "The Riverside cases (our side of them) are nearly ready for the *Appellate Court.* \* \* \* We are a little puzzled to know what to do with your interest. \* \* \* No time is to be lost, as the court sits October 3. You know, generally, the steps taken. The outlay of money is mostly made. Doubtless you can make a satisfactory arrangement with counsel engaged, to attend to your interest, with comparatively little pecuniary liability." On the 16th of the same month Sanders replies, in which he says: "I received to-day your letter of the 14th inst., about my making an arrangement with counsel to attend to my interest in the forthcoming Riverside cases, on appeal, in your *Supreme Court.* I am somewhat in a quandary. It is whether I should make petition to the court to order the record returned, and set forth the facts according to which they were obtained, as I have been solicited to do, or acquiesce in your suggestion, and engage counsel to represent me and attend to my interest before the court, on appeal." And he insists, that in consideration of his having given the other parties the use of the record, his interest should be protected without charge.

On the 21st of the same month he again writes Seelye, referring to the case on appeal, saying: "You seem to think you can make favorable arrangements with counsel able to appear for me. Who is he, and what are the best terms you can make with him?" On the 23d Seelye replied, making a proposition as to terms on which he would take the case, saying, "The counsel I have employed are Herbert, Quick & Miller." To this letter he asks for a reply by telegram, but on the 25th Sanders wrote the letter first above mentioned.

On the 28th, Herbert, Quick & Miller wrote a letter to Seelye, in which they say: "We have considered your proposal in behalf of Mr. Sanders, that we represent his interest in the Appellate Court." They go on to state what they expect to do, and say that they "do not expect to succeed without a desperate contest, first in the *Appellate Court*, second, in the *Supreme Court*, and then, if successful, again in the circuit court." In this letter they decline the proposal by appellant. On the same day Seelye enclosed that letter to Sanders, saying, "I submitted your proposition to Messrs. Herbert, Quick & Miller, and have just received the enclosed." On the 30th Sanders replies, concluding his letter with the statement, "I can not change my proposal, and if not accepted I will await and look on, abiding events." October 3 Seelye again wrote him: "I received yours of the 30th ult., yesterday. I have felt that it was very important that your interests should be looked after by some one, and had engaged Mr. Herbert to appear for you when the case should be called to-day." In this letter he speaks of going to the *Appellate Court*, of the case being called at the opening of court, and a motion to dismiss for want of jurisdiction, etc. October 9 he informs Sanders of the death of Mr. Herbert. October 17, that as Mr. Miller was familiar with the case he should go on with it; and he expressly states, "The case now stands in the *Appellate Court*, on a motion to dismiss," etc. October 26 he again informs him, "The *Appellate Court* this morning denied the

motion to dismiss our Riverside case." October 28 Sanders replies: "I have received yours of the 26th inst., informing me that the Appellate Court denied the motion to dismiss appeal."

This correspondence continued during the pendency of the case, and from it it would seem too clear for argument that appellant fully understood that the case was pending in the *Appellate Court*, and not what he termed the Supreme Court; and it is equally clear that he understood, or at least that he was informed, that the negotiations with him as to fees were with reference to the *Appellate Court*, and not the *Supreme Court*. It may be, and probably is, true, that he did not fully understand our system of courts; but no one can read this correspondence and come to any other conclusion than that the parties intended the special contract between them to relate to services rendered in the court in which the case was then pending, and not to some other court of review to which it might be taken.

On the 27th of June, 1883, Seelye informed Sanders that the Appellate Court had affirmed the Riverside cases, and he again inquires, "Now what shall we do? The parties here want to take it up. It rests largely with you to decide. The expense will not be large. Our briefs are printed. We will have the record of the Appellate Court, and a printed abstract of it. We think we had better go in and fight it out." To which he replies: "If the expense is not going to be great, I should be in favor of going up to the Supreme Court. I would like to have some idea what the expense will be. I do not wish to take another leap in the dark, as I did with McCagg. I am willing to sustain my fair proportion. * * * I think it would be unwise to stop here, after all that has been done, and the principal work performed." July 21, 1883, appeal bonds were forwarded by Seelye, to be executed by Sanders, and in the letter accompanying them he states that the costs of the appeal will not exceed $500. There was no pretence

that there was any contract for attorney's fees in the Supreme Court, except as by the letter of September 25, 1882.

We have carefully examined all the evidence submitted in this case, and we are satisfied that, fairly construed, it justifies the construction placed upon the letter of September 25, 1882, by the circuit and Appellate courts, and that the compensation which the appellees were to receive for services in the Supreme Court was intentionally left. by the parties to be fixed by what should appear to be reasonable, in view of the services performed.

The evidence reported by the master, though somewhat conflicting, fully justified his report fixing that amount at $5000, for Quick & Miller. As to the amount allowed Seelye, the evidence is even more satisfactory, considering it as a whole. But it is insisted that the master in chancery and circuit court allowed him for services in the Appellate Court, whereas the entire $300 which he and Quick & Miller were entitled to under the letter of September 25, had already been allowed Quick & Miller. In his account presented to the master, item 10 was for "services, counsel and disbursements in your behalf in suit of *C. and G. W. R. R. Land Co. et al.* v. *W. L. Peck et al.*, in Appellate and Supreme Courts, $1000." This item was allowed by the master in chancery. Item 6 was for $2000, which the master allowed for $1750. On these two items the court allowed but $1200, and it can not be said that any portion of that sum was necessarily allowed as fees in the Appellate Court.

While this case is not free from difficulty, we are satisfied that the merits are with appellees.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*