In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 04-3562

PAULA JOHNSON,

*Plaintiff,*

*v.*

LELAND CHERRY and
JAMES MISTER,

*Defendants-Appellees.*

APPEAL OF:

BARBARA J. CLINITE,

*Appellant.*

---

Appeal from the United States District Court
for the Southern District of Illinois.
No. 02-1231-DRH—**David R. Herndon**, *Judge.*

---

ARGUED MAY 4, 2005—DECIDED SEPTEMBER 6, 2005

---

Before RIPPLE, ROVNER, and WOOD, *Circuit Judges.*

ROVNER, *Circuit Judge.* When a motion was filed on behalf of plaintiff Paula Johnson seeking leave for Johnson's former attorney, appellant Barbara J. Clinite, to withdraw and for her new counsel to file his appearance, Clinite moved to strike the motion, averring that her signature on the motion had been forged. Following a hearing called to investigate the forgery allegation, the district court found that Clinite had, in fact, signed the

motion. Based in part on that finding, the court on its own motion imposed monetary sanctions on Clinite. Clinite appeals, contending that the finding is clearly erroneous. Although we agree with Clinite that the record hints rather strongly that she did not sign the substitution motion, we need not resolve that question. Rather, because the court imposed sanctions on Clinite without first notifying her that it was contemplating that step and giving her an adequate opportunity to respond, we vacate the sanctions order and remand for reconsideration. The court also ordered Clinite to turn over her case file to Johnson's new counsel, notwithstanding the fact that Johnson has not yet compensated Clinite for her time and expenses nor provided security for that obligation. Clinite contends that in this respect the order disregarded her common-law retaining lien. We direct the court to revisit this issue on remand as well.

## I.

In this civil rights action, which remains pending in the district court, plaintiff Johnson alleges that the two defendant police officers are liable pursuant to 42 U.S.C. § 1983 for arresting her without probable cause. Clinite filed the action on Johnson's behalf in 2002; she also represented Johnson in two other cases in state court and she represented Johnson's mother in another federal suit. A preliminary round of written and oral discovery in the instant case was complete by the summer of 2004, when the events pertinent to this appeal occurred.

Following a settlement conference in June 2004, Johnson advised Clinite that she and her mother were engaging a new attorney, Jeffrey Hammel, to represent them in their two respective federal lawsuits. Clinite contacted Hammel, who told her that he might be taking her place in both cases but could not be sure until he met with Johnson's mother to verify her wishes. That meeting did not take place until

July. In the meantime, Johnson sent Clinite substitution of counsel forms which, according to Clinite, she did not sign. Clinite instead prepared her own forms and sent them unsigned to Hammel along with an itemization of her expenses to date. On or about July 23, Hammel left Clinite a voicemail advising her that he would be seeking leave to replace her as counsel for both Johnson and her mother. Hammel also indicated that he had misplaced the substitution forms Clinite had sent him. On or about July 26, Clinite prepared another set of substitution forms and sent them to Hammel along with another itemization of her time and expenses to date. Clinite avers that she did not place her signature on those forms.

On July 27, Hammel's office electronically filed a substitution motion that bore what appeared to be Clinite's written signature in addition to Johnson's; Hammel had signed the document electronically using the symbol "/s/" followed by his typewritten name. R. 17.[1] Clinite received a copy of the motion by mail on or about

---

[1] In the Southern District of Illinois, most documents are now filed with the court electronically. Southern District of Illinois, E-Filing Rule 1. "When a document has been filed electronically, the official record is the electronic recording of the document as stored by the court, and the filing party is bound by the document as filed." E-Filing Rule 3. Attorneys may sign electronically submitted documents in one of two ways. First, an attorney may sign the document by typing the symbol "/s/" followed by his typewritten name, as Hammel did on the motion to substitute. Alternatively, an attorney may affix his signature in ink to a printed or "hard" copy of the document and then use a scanner to create an electronic version of the signed document for filing. Either way, the attorney's signature is electronic in the sense that only an electronic version of the document is filed with the court. Pursuant to E-Filing Rule 7, an attorney who files a document electronically automatically endorses his or her electronic signature.

July 28. On that same day, the district court granted the motion. R. 18.

On August 5, Clinite filed a motion to strike the substitution motion, averring that the signature on the motion purporting to be hers was not genuine. Specifically, Clinite alleged that the motion "contains a xeroxed copy of my signature taken from another document and inserted on the motion." R. 19 at 3 ¶ 16.

The district court immediately granted the motion to strike and vacated its prior order approving the substitution of attorney Hammel for attorney Clinite. R. 20. In addition, the court directed the person responsible for the apparent forgery of Clinite's signature to explain himself or herself:

> The Court hereby demands an accounting from the responsible party regarding the reason Ms. Clinite's unauthorized signature was used in a document filed with this Court. If this accounting is not received on or before August 16th, this Court will call a hearing and sanctions, more severe than any that would be meted out pursuant to voluntary compliance with this order, will be forthcoming.

*Id.* at 1-2.

Both attorney Hammel and Johnson herself filed statements in response to the court's demand for an explanation. Both denied having improperly inserted Clinite's signature into the motion to substitute. R. 21, 23.

In his response, Hammel acknowledged that he had received a draft (unsigned) motion to substitute from Clinite, a copy of which he attached to the response. R.23 at 2 ¶ 11 & Ex. A. He further disclosed that he also had received motions to substitute from Johnson for both her case and her mother's suit, and that the motions already contained what purported to be the signatures of Clinite, Johnson, and her mother. *Id.* at 2 ¶¶ 13-15. Once Hammel had met with Johnson's mother, Parks, and confirmed

that Parks wished for him to represent her, Hammel directed his secretary to file the motions to substitute that he had received from Johnson. *Id.* at 3 ¶¶ 18-24. Hammel attached to his response a copy of the signed substitution motion for Johnson's suit that Johnson had delivered to his office. *Id.* at 2 ¶ 14 & Ex. B. Interestingly, that version of the motion differs in significant respects from the version that was actually filed. We take note of two prominent differences. First, although the content of the two versions is identical, the text of the filed motion is entirely in capital letters, *see* R. 17, whereas the text of the version attached to Hammel's response is not, R. 23 Ex. B. Moreover, on the second page of the filed version, the text of the final sentence of the motion runs eccentrically down the page in a narrow column to the immediate left of the (purported) signatures of Clinite and Johnson. R. 17 at 2. By contrast, in the version attached to Hammel's response, the text of the final paragraph is entirely above the signatures, within margins that are consistent with the rest of the motion. R. 23 Ex. B at 2. No explanation for the differences between the two versions is supplied in Hammel's response; indeed, Hammel's response did not even acknowledge that the version attached to his response was different from the one his office filed with the court.

Johnson stated in her own response that she "ha[d] never signed the signature of: Attorney Barbara Clinite," R. 21 at 2, that the substitution of counsel forms had been sent to her in East Saint Louis by mail from Chicago, Illinois, *id.* at 4 (from whom her statement did not make clear, but presumably from Clinite), and that any suggestion that she herself may have forged Clinite's signature was "[f]raudulent" and "unfounded," *id.* at 5, 6. Johnson also alleged that Clinite owed her the sum of $2,700 "for services as a legal clerk." *Id.* at 7. In apparent support of that allegation, Johnson submitted a series of letters that Clinite had written to her. R. 21 (sealed attachments); *see also* R.

25 (sealed attachments). That correspondence revealed that Clinite, who apparently lacked the ability to file documents electronically from her own outdated computer, occasionally had relied on Johnson and others to electronically file documents on her behalf. *See* R. 21 (sealed attachments).

In an order dated August 18, 2004, in which the district court denied a request for recusal filed by Johnson, the court took the opportunity to schedule a hearing regarding the unauthorized signature of Clinite on the substitution motion. The court noted that at that hearing, it would also address Clinite's use of Johnson and others to file documents electronically, which the court found "troubling." R. 26. at 7.

In advance of that hearing, Clinite filed a document that, in part, responded to the court's concern about her having used Johnson and others to file documents on her behalf. Clinite indicated that when the Southern District of Illinois had adopted the electronic filing system and had denied her request for an extension of time to comply with the requirements of that system, she had begun to file documents electronically by scanning paper or "hard" copies into the system at the Clerk's offices in Benton and East St. Louis. Because of the distance between her office in Chicago and the Southern District, however, Clinite had in certain instances recruited Johnson to do this task for her. R. 27 at 1 ¶¶ 2-3. Accordingly to Clinite, most if not all of the documents that she asked Johnson to file for her in this manner were documents that were filed in Johnson's own case, her mother's case, or a case involving a cousin of Johnson's. *Id.* ¶ 3. Clinite indicated that she never gave Johnson a document to file that she (Clinite) had not already signed. *Id.* ¶ 4. Clinite further averred that she had never explained to Johnson how to affix a typewritten "/s/" version of Clinite's signature to a document, nor had she ever instructed Johnson to affix such a signature to a document. *Id.* at 1-2 ¶¶ 4-6. Clinite pointed out that the

signature purporting to be hers on the substitution motion appeared to be an actual handwritten signature rather than a typewritten signature. *Id.* at 6 ¶ 33.

On August 31, 2004, the district court conducted a hearing to resolve who had affixed Clinite's signature to the substitution motion. Johnson and Hammel were present at the hearing, and each of them reiterated that they had not inserted or otherwise forged Clinite's signature. Clinite similarly reiterated that she had not signed the motion. When questioned by the court, Clinite conceded that the signature on the substitution motion looked like her own signature, but she suggested that someone must have photocopied her signature from another document and inserted it into the substitution motion. R. 49 at 12-13.

Initially, the court seemed to agree that Clinite's signature might have been copied and inserted into at least one of the two versions of the substitution motion that (purportedly) bore her signature (i.e, the version attached to Hammel's response, and the different version that was actually filed). *See* R. 49 at 12 (referring to a version of the motion "that's obviously a cut and paste job"). Indeed, the court appeared to suspect that it was Johnson who had copied Clinite's signature and affixed it to the motion. *See* R. 49 at 16 (court admonishes Johnson "to tell me with a straight face here what happened," because "everything looks like you're the person that submitted these forged signatures").

However, after hearing from Johnson, who insisted that she had received the motion from Clinite with Clinite's signature already on it, the court voiced the suspicion that Clinite herself had, in fact, signed at least one version of the motion that the court referred to as the "original." R. 49 at 26. By "original," we assume that the court was referring to the version that Hammel had attached to his response, rather than the version that actually was filed. "Are you

really serious in [your] denial?" the Court asked Clinite. R. 49 at 26. The court continued:

> I mean, I'm looking at the exhibit. I don't know how that could have been Xeroxed from some other exhibit. It certainly doesn't look like it's a cut and paste job on the original motion. Certainly it is on the other one but doesn't look like it on the original.

*Id.* at 26. Clinite again insisted that she had not signed either version, pointing out as she did so the differences between the two versions of the motion. *Id.* at 28. Clinite added that if she had signed the substitution motion and forwarded it to Johnson, as Johnson asserted, then someone ought to be able to produce an original with her signature in ink. *Id.* (As nearly all documents are now filed electronically in the Southern District of Illinois, the official court file for a given case no longer contains the original paper versions of filed documents, signed in ink, as it did in the past. Rather, the electronic recording of each document as stored in the court's Electronic Case Files system is considered to be the "official" record of that document. Southern District of Illinois, E-Filing Rule 3. *See* n.1, *supra.*) The court, thinking Clinite's point to be reasonable, asked Hammel whether a signed original could be produced. *Id.* at 29. Hammel's attorney confessed that "[w]e do not have an original in our possession . . . ." *Id.* at 30.

Faced with denials all around, the court in the end concluded that Clinite had, in fact, signed the substitution motion. Although the court recognized that there were two different signed versions of the motion and that no explanation for that fact was forthcoming, the court evidently believed that Clinite had signed both of them:

> I quite frankly believe that the signatures are in fact Ms. Clinite's. Ms. Clinite, I know you said that you didn't sign these things. I don't know—I'm not sure

what your motivation is. I wish we had an original copy that I could . . . do the smear test on,[2] but frankly I just cannot see how that signature can be replicated. I cannot for the life of me explain why we have two separate motions in different fonts. There just doesn't seem to be any answer for that. . . .

* * *

I don't find that Ms. Johnson bears any responsibility here. These documents, I'm quite sure, were forwarded by you, that they were signed by you, that there was no forgery, and that your suggestion to the Court that some hoax had been played on the Court was a false suggestion. And I don't know whether it was, as Ms. Johnson suggested, motivated by some desire to delay the proceedings. I don't pretend to know what the motivation was. I think the motivation, frankly, was more likely to extract your fees and expenses to date. But only you know that. So there will be no sanctions [against Mr. Hammel or Ms. Johnson].

*Id.* at 35-37.

In the course of the hearing, the court addressed two other matters that had arisen during the briefing on who was responsible for placing Clinite's signature on the substitution motion. First, as the court had noted in its August 18 order denying Johnson's request for recusal, the briefing had revealed that Clinite had relied on Johnson to file certain documents electronically in the instant

---

[2] A smear test is a simple but effective way of identifying the original copy of a document signed in ink. As explained by Hammel's counsel at the August 31 hearing, one conducts such a test by wetting one's thumb or finger and rubbing it on the signature. If the document is the original copy, the ink of the signature will smear; if the document is a photocopy, the signature will not smear. R. 49 at 30.

case as well as the cases filed by Johnson's mother and cousin. For that purpose, Clinite had disclosed her login name and password to Johnson. The court indicated at the August 31 hearing that the disclosure violated Southern District's E-Filing Rule 2, which in relevant part provides that "[n]o Filing User or other person may knowingly permit or cause to permit a Filing User's password to be used by anyone other than an authorized agent of the Filing User." R. 49 at 4, 14-16.

The briefing as to the validity and source of Clinite's signature had also revealed that Clinite was seeking recompense for her accumulated fees and expenses before she turned over Johnson's file to Hammel. Clinite asserted that under Illinois law, a discharged attorney has a right to a retaining lien, and thus may hold a client's papers, until such time as her fees and expenses are paid or sufficient security is provided. R. 27 at 6 ¶ 31. The court took note of this assertion at the hearing. R. 49 at 35. The court suggested that it was unethical of Clinite to refuse to turn over Johnson's file until she was paid, and that the cases Clinite had cited in support of her retaining lien did not, in fact, support her position. *Id.* at 35-36.

On September 1, 2004, the day after hearing, the court issued an order sanctioning Clinite on three grounds. R. 32. The court found first that Clinite had violated Rule 2 of the Electronic Filing Rules of the Southern District of Illinois by supplying her login and password to Johnson. For that transgression, the court ordered Clinite to pay a sanction of $500 to the District Court Clerk. R. 32 at 2. Second (and third), the court found that Clinite had lied to the court in two instances: Clinite had falsely represented that the signature on the motion to withdraw was not hers, and she had also claimed falsely in the ensuing briefing never to have told Johnson how to sign a document with a typewritten signature (when correspondence between Clinite and

Johnson showed that she had). For those misrepresenta-tions, the court sanctioned Clinite in the amount of $500, again payable to the Court. *Id.* at 2-3. To partially reim-burse Hammel for the time he had spent in responding to Clinite's allegations, the court also ordered Clinite to pay him $300. *Id.* at 3. These sanctions came to a total of $1,300, which Clinite was to pay within two weeks. *Id.* Finally, the court directed Clinite to promptly turn over Johnson's file to Johnson's new counsel or to Johnson herself . *Id.* at 3-4.

Clinite timely appealed the September 1 order. R. 40.

## II.

### A. Sanctions

As we have noted, there were three bases for the im-position of sanctions against Clinite: (1) Clinite's breach of Rule 2 of the Southern District's E-Filing rules, by giving her password to Johnson; (2) Clinite's false representation to the court that she had not instructed Johnson how to sign documents electronically; (3) Clinite's false representa-tion, in her motion to strike the substitution motion, that she did not sign the motion. Only the second and third of these grounds are at issue in this appeal; Clinite does not challenge the sanctions imposed for her violation of the E-Filing rules.

We note at the outset that the district court did not specify on what authority it was sanctioning Clinite. There are three possibilities. First, Federal Rule of Civil Proce-dure 11 permits a court to sanction an attorney for a pleading or other document that (among other potential transgressions) is presented for an improper purpose or makes factual representations that are without rea-sonable evidentiary support. *See* Fed. R. Civ. P. 11(b)(1) and (3), (c). Second, under 28 U.S.C. § 1927, an attorney "who so

multiplies the proceedings in any case unreasonably and vexatiously" may be held to account for the excess fees and other costs resulting from her improper conduct. Finally, a court has the inherent authority to impose sanctions for actions taken "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46, 111 S. Ct. 2123, 2133 (1991) (internal quotation marks and citations omitted); *see also G. Heileman Brewing Co. v. Joseph Oat Corp.*, 871 F.2d 648, 651-52 (7th Cir. 1989) (en banc).

Generally, we review a district court's decision to sanction an attorney for abuse of discretion. *E.g.*, *Kovilic Constr. Co. v. Missbrenner*, 106 F.3d 768, 771 (7th Cir. 1997). Although this standard of review is deferential, it is not toothless. As we have observed with respect to sanctions imposed pursuant to Rule 11:

> Rule 11 sanctions have significant impact beyond the merits of an individual case. Concerns for the effect on both an attorney's reputation and for the vigor and creativity of advocacy by other members of the bar necessarily require that we exercise less than total deference to the district court in its decision to impose Rule 11 sanctions.

*Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 936 (7th Cir. 1989) (en banc) (internal quotation marks and citations omitted); *see also Bilharz v. First Interstate Bank of Wisconsin*, 98 F.3d 985, 989 (7th Cir. 1996).

Clinite contends that the district court's sanctions order represents an abuse of discretion in two senses. First, the sanctions order rests in part on the factual finding that Clinite lied when she claimed not to have signed the substitution motion. Clinite contends that this finding was clearly erroneous. A sanctions award that rests on a clearly erroneous assessment of the evidence amounts to an abuse of discretion. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S. Ct. 2447, 2461 (1990). Second, Clinite

contends that the district court failed to give her adequate notice of its intent to sanction her for the misrepresentations it believed her to have made. "[T]he imposition of sanctions requires that the party to be sanctioned receive notice of the possible sanction and the opportunity to be heard." *Larsen v. City of Beloit*, 130 F.3d 1278, 1286 (7th Cir. 1997). A district court's decision to impose sanctions *sua sponte* without adequate notice to the sanctioned party also represents an abuse of the court's sanctions power. *See, e.g.*, *Johnson v. Waddell & Reed, Inc.*, 74 F.3d 147, 151-52 (7th Cir. 1996) (per curiam).[3]

After a thorough review of the record, we conclude that the sanctions award must be vacated for the second of the two reasons Clinite has advanced. Although the record, in our view, lends substantial support to Clinite's assertion that someone photocopied her signature and affixed it to the substitution motion, and that the district court therefore clearly erred in finding otherwise, we need not resolve that question. For we agree with Clinite that the court, in deciding to impose sanctions on its own initiative, was required to give Clinite notice of the specific conduct for which it was contemplating sanctions and to afford her the opportunity to show cause why sanctions were not in order. This the court did not do. Had it done so, the court's findings might well have been different.

The record before us reveals rather strong clues that Clinite did not sign the substitution motion filed with the court. Without undertaking to discuss these clues

---

[3] We note that in her written response to the district court's inquiry regarding Clinite's signature, Johnson did ask the court to sanction Clinite (as well as defense counsel) for conduct that Johnson considered unlawful. R. 21 at 8. Johnson did not elaborate on the grounds for her request, however. That cursory request consequently did not serve to put Clinite on notice of her potential liability for sanctions.

exhaustively, we take note of the following points.

First, it is undisputed that after learning of her client's wish for Hammel to take her place, Clinite prepared her own version of the substitution motion and forwarded it (without her signature) to Hammel. Hammel himself acknowledged receipt of Clinite's version and attached it to the memorandum he filed with the court. R. 23 at 2 ¶ 11 & Ex. A. The motion that was filed, however, differs in substantial respects from the version that Clinite admittedly prepared: the text of the filed version is different from, and more lengthy than, the text of the version Clinite sent to Hammel; the fonts of the two versions are markedly different; the version that Clinite prepared is a single page, whereas the filed motion is three pages long; and Clinite's version includes her name and contact information as the preparer of the document. Compare R. 17 with R. 23 Ex. A.

Second, certain aspects of the filed version of the motion are so crude as to be almost comical. The second page of the motion, which contains the purported handwritten signatures of Clinite and Johnson, presents a veritable collage of fonts: (1) the text of the motion is typed in one font; (2) under the line for her signature, Clinite's name, and a portion of her contact information as well as the notation that she was the attorney for the plaintiff, appear in a second font; (3) some of this same information (i.e., Clinite's contact information and status as the plaintiff's counsel) has been completed in a third font which at points runs over the information in the second font; and (4) under the line for Johnson's signature, Johnson's typewritten name appears in yet a fourth and oddly spaced font. R. 17 at 2. Moreover, as we noted earlier, the last sentence of the text of the motion runs strangely down the left-hand side of the page in a narrow column, as if to make room for the

signature block to its right. *Id.*[4] The suggestions of tampering are so transparent in this document that even the district court appeared to agree, until almost the end of the August 31 hearing, that it was an obvious "cut and paste job." R. 49 at 26; *see also id.* at 12, 20.

There is, in addition, the unexplained fact that there is yet another version of the motion, identical in text to the filed version but without the gross abnormalities in the fonts and the text wrapping around the signature block. R. 23 Ex. B. This was the version that Hammel attached to his submission. Clinite purportedly signed that version as well, along with Johnson; and yet there is no apparent reason why Clinite would have prepared and signed more than one version of the same motion.[5]

Finally, there is the fact that Hammel, whose office filed the substitution motion by scanning it into the electronic document management system, could not produce the original copy of the motion that was purportedly signed in ink by both Johnson and Clinite. The original copy likely would have made it a relatively simple matter to confirm that Clinite had, in fact, signed the motion and to dispel any notion of tampering.

What seems to have taken the district court part of the way to finding that Clinite did sign the motion was the fact that she had a unique signature that would be diffi-

---

[4] By "signature block," we mean both the signature and the typewritten identifying information below the signature line.

[5] Clinite acknowledged having sent Hammel a second set of substitution motions after he misplaced the original set; however, she averred that she sent both sets to Hammel unsigned. *See* R. 19 at 2 ¶¶ 6-7, 10-11; R. 27 at 3 ¶¶ 12-13, 16-17, and *id.* at 5 ¶¶ 28-29. Hammel's own statement, which attaches a copy of one of the substitution forms Clinite sent to him, confirms that Clinite did not sign that form. *See* R. 23 at 2 ¶ 11 & Ex. A.

cult for anyone to imitate convincingly. R. 49 at 30. We readily agree with the court that the signature on the filed motion looks quite like hers. Indeed, it is the fact that the signature on the filed motion looks *identical* to Clinite's signature on other documents which so strongly hints of tampering.

With the benefit of time, Clinite has identified four documents that appear to have the identical signature block with her signature. These include: (1) the substitution motion filed in the instant case; (2) the different version of the same motion that Hammel attached to his memorandum; (3) a separate substitution motion filed in *Parks v. Harrison*, the federal lawsuit brought by Johnson's mother; and (4) a proposed report and discovery plan prepared for filing in *Love v. Miller*, the federal lawsuit brought by Johnson's cousin. What is remarkable about these documents is not only that the signature itself appears to be identical in all four instances—one can hold the copies up to the light and see that the match is nearly exact, with any variations apparently due to photocopying—but that the signature intersects with the typewritten identifying information below the signature line in exactly the same spots and exactly the same ways in all four cases. The signs could not be more clear that the entire signature block was lifted from the earliest of the documents (the proposed discovery plan) and pasted into the various substitution motions before they were scanned for electronic filing.

In this regard, we have the advantage of a record that is more developed than the one before the district court at the time it imposed sanctions on Clinite. It was only after the court found that Clinite signed the substitution motion and sanctioned her for claiming otherwise that Clinite was able to assemble the documents prepared and/or filed in the various lawsuits and back up her contention that someone had copied and inserted her signature into the substitution

motion.[6] To our mind, this exposes the most fundamental problem with the sanctions order.

As we have noted, before a court may impose sanctions *sua sponte*, it must give the offending party notice of its intent to do so and the opportunity to be heard. This is true whether the court is sanctioning a party pursuant to its authority under Rule 11, section 1927, or its inherent authority. *Larsen v. City of Beloit*, *supra*, 130 F.3d at 1286-87; *see also United States v. 1948 South Martin Luther King Drive*, 270 F.3d 1102, 1115-16 (7th Cir. 2001); *In re Rimsat, Ltd.*, 212 F.3d 1039, 1045-46 (7th Cir. 2000). "Providing such notice and a hearing prevents misunderstandings between the offending party and the sanctioning judge, provides an orderly manner and calm forum in which each party has had time to prepare adequately, and certainly aids our review on appeal." *1948 South Martin Luther King Drive*, 270 F.3d at 1116. A general notice that the court is contemplating sanctions is insufficient; rather, the offending party must be on notice of the specific conduct for which she is potentially subject to sanctions. *See Rimsat*, 212 F.3d at 1045-46.

The district court did not comply with the notice requirement. As relevant here, the court sanctioned Clinite for making two statements to the court that the court believed to be false: (1) in asking the court to strike the substitution motion, Clinite had averred that she did not sign the substitution motion; and (2) in the follow-up briefing as to who might be responsible for the signature other than Clinite, Clinite had represented that she never

---

[6] Clinite presented that proof when the district court subsequently ordered her to show cause why she had not yet complied with the sanctions order. *See* R. 36, 39. Clinite did not ask the court to reconsider the sanctions order at that time, however, nor did the district court do so of its own initiative.

instructed Johnson how to indicate that a document was being signed electronically. Prior to the August 31 hearing, the court did not warn Clinite that it was considering sanctions against her on these grounds. It was not until the end of that hearing that the court determined that Clinite had, in fact, signed the substitution motion. And it was not until the following day, when the court issued its written sanctions order, that it found Clinite was untruthful about telling Johnson how to sign a document with a typewritten signature. Thus, Clinite was never given the opportunity to demonstrate why she should not be sanctioned on those particular grounds.

Of course, the court did convene the August 31 hearing—which is labeled in the record as a "show cause" hearing (R. 49 at 1)—for the purpose of ferreting out who was responsible for the signature on the substitution motion that Clinite claimed was not hers; and the court had issued a general warning that it would sanction the individual who was responsible. The written memoranda that Hammel, Johnson, and Clinite herself filed in advance of that hearing, and the statements they made at the hearing itself, reflect a common awareness that each of them had some amount of explaining to do and that sanctions were in the offing. Clinite, like the others, was given the opportunity before and at the hearing to recount her own version of events. This was not, then, a case in which the court made use of its power to sanction without any forewarning and without first hearing the parties involved.

But the August 31 hearing was convened to determine who was responsible for improperly affixing Clinite's signature to the substitution motion, and not until that hearing was nearly at an end could Clinite reasonably have appreciated that she herself might be subject to sanctions

in that regard.[7] Prior to the hearing, the district court plainly accepted as true Clinite's representation that she did not sign the substitution motion. The court ordered the motion stricken and vacated its order allowing the substitution on the strength of that averment. *See* R. 20 at 1. It simultaneously "demand[ed] an account from the responsible party regarding the reason Ms. Clinite's *unauthorized* signature was used in a document filed with this Court." *Id.* (emphasis ours). When, after receiving written memoranda from the parties on the subject, the court issued its order scheduling the August 31 hearing in which it again referred to Clinite's signature as "unauthorized." R. 26 at 7. In advance of the hearing, then, Clinite had no reason to think that the court might reverse itself and conclude that she actually had signed the substitution motion. Nor had Clinite reason to suspect that she might be sanctioned for making a misstatement as to whether or not she had given Johnson instructions as to how to sign a document by typing Clinite's name with the "/s/" symbol. This was a subject that happened to come up in the parties' memoranda regarding Clinite's signature. It was not central to that question, as the signature on the substitution motion was (purportedly) a traditional ink signature rather than a typewritten one. More to the point, the court gave no indication when it convened the hearing (or at any point prior to its sanctions order) that Clinite's representation was a potential basis for sanctions; the subject was not even discussed at the August 31 hearing.

---

[7] An argument could be made that Clinite was on notice prior to the hearing that the court might discipline her for having used Johnson and others to file documents electronically in her stead. When the court set the hearing for August 31, it noted that it would address this revelation, which it found "troubling." R. 26 at 7 & n.3. We need not decide whether this statement, which did not mention the possibility of sanctions, constituted sufficient warning, as Clinite has not appealed the sanctions imposed for her violation of the E-Filing Rules.

Clinite therefore was deprived of the opportunity to confront the court's belief that she had engaged in sanctionable conduct and to convince the court (or to try) that she should not be sanctioned. The case that Clinite has mustered on appeal demonstrates that she was prejudiced, at least in part, by the lack of such an opportunity: once apprised of the court's basis for imposing sanctions, she has been able to demonstrate that one of the principal grounds for sanctions was based on a factual finding (that she actually signed the substitution motion) that quite possibly was clearly erroneous.[8] Clinite presumably could have made the same case to the district court directly by filing a motion to reconsider the sanctions order (she did make similar arguments in her response to the rule to show case). But the opportunity to make her case after the court has imposed sanctions is not an adequate substitute for an opportunity to be heard in full before sanctions are ever imposed. *Johnson v. Waddell & Reed, Inc.*, *supra*, 74 F.3d at 151.

We must therefore vacate the award of sanctions insofar as it was based on the two grounds that Clinite has challenged on appeal. Respecting the district court's role as the finder of fact, we leave it to that court whether it still wishes to contemplate sanctions against Clinite on these two grounds. Any further proceedings as to potential sanctions must, however, afford Clinite notice of the specific bases on which the court is contemplating sanctions and an adequate opportunity to respond.

---

[8] By contrast, Clinite concedes that she did misstate the facts when she averred that she had never instructed Johnson how to sign a document with a typewritten signature. Clinite Br. 21. She argues, however, that had she been given the opportunity to show cause why she should not be sanctioned for that misstatement, she would have explained to the court that the misstatement was inadvertent rather than a deliberate lie and she would have formally withdrawn the representation. *Id.* at 21-22, 23.

**B.**

In the briefing on the motion to substitute, it emerged that Johnson had not yet paid Clinite for her accumulated fees and expenses and that Clinite, relying on her retaining lien over the documents in her possession, was waiting until she was paid before she produced Johnson's file to Hammel as Johnson's new attorney. R. 27 at 5-6 ¶¶ 30-31. The district court acknowledged Clinite's position at the August 31 hearing and suggested that it was unethical for Clinite not to turn over the file to Hammel. R. 49 at 35-36. In the sanctions order issued on the following day, the court ordered Clinite "to promptly deliver her client's file to her new attorney, whoever that may be, or to her client, if she proceeds *pro se*." R. 32 at 3-4. The court added that "[i]n order . . . to protect her fees and expenses, Ms. Clinite should perfect her attorney's lien." *Id.* at 4. The court's reference to perfecting her "attorney's lien" was evidently not a reference to Clinite's retaining lien but rather to a distinct lien she might assert under section 1 of the Illinois Attorney's Lien Act, 770 ILCS 5/1. That act provides that "[a]ttorneys at law shall have a lien upon all claims . . . which may be placed in their hands for suit or collection . . . for the amount of any fee which may have been agreed upon by and between such attorneys and their clients . . . ." In order to enforce such a lien, the statute requires the attorney to first perfect it by serving written notice on the party against whom her client is asserting the underlying claim. *Id.*; *see People v. Philip Morris, Inc.*, 759 N.E.2d 906, 911 (Ill. 2001).

Clinite challenges the district court's order that she produce Johnson's file before she has been adequately compensated for her services. Clinite contends that Illinois law recognizes a retaining lien that entitles her to retain the file until she is paid. She adds that the statutory

lien to which the district court referred does not adequately protect her right to reasonable compensation. We review the court's order to produce the file for abuse of discretion. *See First Wisconsin Mortgage Trust v. First Wisconsin Corp.*, 571 F.2d 390, 396 (7th Cir.), *rev'd in part on other grounds on reh'g*, 584 F.2d 201 (7th Cir. 1978) (en banc).

Under Illinois law, when an attorney-client relationship terminates for a reason other than professional misconduct and the attorney has a claim against the client for unpaid fees and expenses, the attorney may assert a retaining lien in furtherance of her right to compensation. *E.g.*, *Twin Sewer & Water, Inc. v. Midwest Bank & Trust Co.*, 720 N.E.2d 636, 639-40 (Ill. App. Ct. 1999); *Upgrade Corp. v. Michigan Carton Co.*, 410 N.E.2d 159, 161 (Ill. App. Ct. 1980). The retaining lien is a common-law lien that attaches to documents or other property that come into the attorney's possession in the course of her professional relationship with the client. *Twin Sewer & Water*, 720 N.E.2d at 640; *Upgrade*, 410 N.E.2d at 161. The reach of the lien extends to the client's file. *In re Coronet Ins. Co.*, 698 N.E.2d 598, 601 (Ill. App. Ct. 1998). As its name suggests, the retaining lien permits the attorney to retain the file in her possession until such time as the client has either satisfied her claim for fees and expenses or supplied security adequate to protect the attorney's interest. *In re Browy*, 527 F.2d 799, 801 (7th Cir. 1976) (per curiam) (applying Illinois law); *Twin Sewer & Water*, 720 N.E.2d at 640; *Upgrade*, 410 N.E.2d at 161.

The retaining lien is to be distinguished from what is known as a charging or special lien. Although a charging lien also secures an attorney's right to compensation, it attaches only to the proceeds that the client might recover in pursuit of a claim for which the attorney was engaged to represent the client. *See Twin Sewer & Water*, 720 N.E.2d at 639-40; *Upgrade*, 410 N.E.2d at 161. This is this type of lien that the Illinois Attorneys' Lien Act recognizes and

regulates. *Twin Sewer & Water*, 720 N.E.2d at 639-40. Although the charging lien has the advantage of being an "active" lien that an attorney may take affirmative steps to enforce against his client, *see id.*, its utility depends on the client succeeding on his underlying claim for relief. Consequently, the charging lien is not viewed as an adequate substitute for the retaining lien, which the attorney may assert regardless of the success his former client achieves on the claim. *Upgrade*, 410 N.E.2d at 162.

By contrast, the retaining lien is a "passive" lien that the attorney cannot foreclose upon or otherwise use offensively to wrest payment from his client. *See Browy*, 527 F.2d at 801; *Twin Sewer & Water*, 720 N.E.2d at 640; *Upgrade*, 410 N.E.2d at 161. The lien, however, can be asserted defensively when the client demands production of her file. *Browy*, 527 F.2d at 801. And the possessory right it confers effectively enables the lawyer to "hold[ ] the client's property hostage until fees are paid." *Twin Sewer & Water*, 720 N.E.2d at 640 (quoting Stephanie W. Kanwrit, *Attorneys' Liens: When Can You Retain a Client's Files*? 79 Ill. Bar J. 274, 274 (1991)). The retaining lien thus gives the attorney significant leverage in his demand for compensation.

The possessory right conferred on the attorney by the retaining lien is not unbounded, however. Under certain circumstances, an unpaid attorney's right to hold on to his former client's documents may yield when the client or a third party demonstrates a need for access to those documents. *See Upgrade*, 410 N.E.2d at 161 ("the courts have exercised their inherent power to order an attorney to release property in his possession in the interest of equity and fairness"); *see also, e.g.*, *Browy*, 527 F.2d at 801-02 (allowing bankruptcy trustee to inspect corporate records in attorney's possession so that trustee could properly administer the estate); *Jernryd v. Nilsson*, 117 F.R.D. 416, 417-18

(N.D. Ill. 1987) (allowing third parties access to documents in law firm's possession in order to facilitate complete discovery and equitable administration of justice); *but see Anthony v. Bitler*, 911 F. Supp. 341, 343 (N.D. Ill. 1996) (denying former client's motion to compel production of documents in attorney's possession that client alleged were necessary to support his claim in pending litigation, where plaintiff "ha[d] not persuaded the court that the documents are central to his claim or that the administration of justice requires production").

So far as the record in this case reveals, the district court ordered Clinite to surrender Johnson's file without considering whether, as Clinite alleged, she was owed fees and expenses, without determining the validity of Clinite's retaining lien, without assessing Johnson's need for access to her file, and without balancing that need with Clinite's interest in securing her right to compensation. The record does bespeak the court's concern with the ethics of retaining a former client's file, and the court's admonition that Clinite perfect her attorney's lien suggests that the court believed her statutory lien sufficient to secure her right to compensation. For the reasons that follow, we believe the court must give this issue further attention on remand.

As a general matter, a lawyer's ethical duties to her client do not preclude an attorney from invoking her retaining lien in furtherance of her right to compensation. *See* Ill. Rule of Professional Conduct 1.8(i)(1); *see also* American Bar Association's Model Rules of Professional Conduct 1.8(i)(1), 1.16(d) (2000). This is not to say that retaining liens are beyond criticism. *See* John Leubsdorf, *Against Lawyer Retaining Liens*, 72 Fordham L. Rev. 849 (2004) (urging abolition of retaining lien). But the lien has been recognized and enforced in Illinois for more than 100 years. *See Sanders v. Seelye*, 21 N.E. 601, 603 (Ill. 1889).

Second, the distinct charging lien that Clinite may pursue

under the Illinois Attorneys' Lien Act does not displace her retaining lien, nor does it permit a court to disregard the latter lien. There is no certainty that Johnson will recover anything in this suit; only if she does would a charging lien be of any use to Clinite. The charging lien therefore is not an adequate substitute for the possessory right that the retaining lien bestows on Clinite. *Upgrade*, 410 N.E.2d at 162.

Third, there has not yet been a showing of the kind that would justify an order directing Clinite to surrender possession of her file. For example, Johnson has not established a need for access to the documents in her file, nor has she presented evidence that she lacks the means either to pay Clinite's reasonable fees and expenses or to post adequate security.[9] She may well be able to make both showings, but until she does, the district court may not simply disregard the retaining lien Clinite has asserted.

In short, the court has not engaged in the requisite analysis and balancing of the respective rights of Clinite and Johnson. We leave it to the district court on remand to accomplish that task, following an appropriate development of the record. We note that if Johnson disputes owing any fees or expenses to Clinite or the amount of those fees and expenses, the district court may also determine the amount that Clinite is owed. *See Twin Sewer & Water*, 720 N.E.2d at 642; *Upgrade*, 410 N.E.2d at 162.

## III.

---

[9] Johnson did make an abbreviated attempt to make such a showing in a pro se filing alerting the district court to Clinite's non-compliance with the sanctions order. *See* R. 35 at 1. But so far as the record reveals, the district court has not yet made any determination as to Johnson's need for access to the documents in Clinite's possession.

Because the district court did not provide adequate notice to Clinite of the grounds on which it decided to sanction her and the opportunity to show cause why she should not be sanctioned on those grounds, we vacate the sanctions order in part. Because the court did not adequately consider Clinite's retaining lien and balance Clinite's right to compensation for her fees and expenses with Johnson's interests, we also vacate the court's directive that Clinite produce Johnson's file to Johnson and/or Johnson's new counsel.

As we have indicated, the underlying litigation is still pending in the district court. Circuit Rule 36 shall not apply to the underlying litigation.

However, as to the sanctions and the possession of Clinite's file, Circuit Rule 36 shall apply on remand. In its decision to sanction Clinite, the district judge made certain findings, including the finding that Clinite had lied to the court, that necessarily depend on the judge's assessment of her credibility. Having concluded that a fresh assessment of the evidence is in order both as to the decision to sanction Clinite for what the district judge believed were her deliberate misrepresentations to the court and as to the order that Clinite surrender Johnson's file without compensation or security, we believe that assessment must be made by a judge who has not already resolved questions of credibility against Clinite.

The sanctions matter and the dispute over the production of Johnson's file shall therefore be assigned to a different judge, and that judge shall conduct such further proceedings as are consistent with this opinion.

Clinite shall bear her own costs of appeal.

VACATED AND REMANDED WITH DIRECTIONS.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*