Michael D. JUDY, Plaintiff,

v.

PREFERRED COMMUNICATION SYSTEMS, INC., a Delaware corporation, and Charles M. Austin, Defendants.

C.A. No. 4662–VCL.

Court of Chancery of Delaware.

Submitted: Aug. 12, 2011.

Decided: Aug. 19, 2011.

Matt Neiderman, Gary W. Lipkin, Duane Morris LLP, Wilmington, Delaware; Attorneys for Plaintiff.

David L. Finger, Finger & Slanina, LLC, Wilmington, Delaware; Attorney for Defendant Preferred Communication Systems, Inc.

Charles M. Austin, Pro Se Defendant.

Peter J. Walsh, Jr., Janine M. Salomone, Potter Anderson & Corroon LLP, Wilmington, Delaware; Attorneys for Subpoenaed Third–Party Potter Anderson & Corroon LLP.

Peter B. Ladig, Brett M. McCartney, Morris James LLP, Wilmington, Dela-

ware; Attorneys for Third–Party Objector Raymond A. Hebrank, Trustee of the Raymond A. Hebrank Voting Trust.

Sean T. O'Kelly, Ryan M. Ernst, O'Kelly & Ernst, LLC, Wilmington, Delaware; Attorneys for Third–Party Objector Jeffrey Gast.

Bruce E. Jameson, Kevin H. Davenport, Prickett, Jones & Elliott, P.A., Wilmington, Delaware; Attorneys for Third–Party Objector Kenneth W. Fry.

Adam L. Balick, Melony R. Anderson, Balick & Balick, LLC, Wilmington, Delaware; Charles J. Ryan, III, Law Offices of Charles J. Ryan, Upper Marlboro, Maryland, Attorneys for Third–Party Objectors Alejandro Calderon and Angel Benitez.

David E. Wilks, Thad J. Bracegirdle, Wilks, Lukoff & Bracegirdle, LLC, Wilmington, Delaware; Attorneys for Third–Party Objector Linda S. Allen, as Trustee for the C. Robert Allen Administrative Trust, dated April 4, 2009, and on behalf of Certain PCSI Noteholders.

David A. White, Daniel M. Silver, McCarter & English, LLP, Wilmington, Delaware; Attorneys for Third–Party Intervenor Preferred Investors Association.

Richard L. Renck, Ashby & Geddes, P.A., Wilmington, Delaware; Receiver.

## OPINION

LASTER, Vice Chancellor.

Plaintiff Michael D. Judy moved to enforce a subpoena and compel the production of documents from his former counsel, Potter Anderson & Corroon LLP ("Potter Anderson"). Approximately four months ago, Potter Anderson withdrew from representing Judy for reasons including unpaid bills. Potter Anderson and Judy could not resolve their fee dispute, and Potter Anderson asserted a retaining lien over its files. Judy contends that he needs the documents held by Potter Anderson in order to prepare for trial. I have concluded that under the facts presented, Judy is entitled to the documents he seeks, but only if he first posts security in the amount Potter Anderson has requested, *viz.*, cash in escrow or a secured bond equal to 70% of the firm's outstanding receivable.

## I.  FACTUAL BACKGROUND

Judy owns shares of Preferred Communication Systems, Inc. ("Preferred" or the "Company"). Between 1998 and 2000, Preferred obtained licenses to provide wireless telecommunications services in Puerto Rico, the U.S. Virgin Islands, and certain portions of the United States. Over a decade later, Preferred has yet to capitalize on its licenses, and the record reveals significant disputes over whether Charles M. Austin, the Chairman, President and sole director of the Company, breached his fiduciary duties by failing to properly maintain the licenses. At present, the Company is little more than a shell with neither operations nor cash.

### A.  Potter Anderson Commences Litigation.

In February 2009, Judy formed Preferred Spectrum Investments, LLC ("PSI") as a vehicle for investors in Preferred to seek change at the Company. Judy serves as President of PSI. In May 2009, Judy and PSI retained Potter Anderson to pursue claims against the Company and Austin. Later that month, Potter Anderson served a demand for books and records on the Company pursuant to Section 220 of the General Corporation Law, 8 *Del. C.* § 220. After the Company rejected the demand, Potter Anderson filed suit. In July, Potter Anderson filed a second action seeking to compel a meeting of stockholders pursuant to Section 211 of the General Corporation

Law, 8 *Del. C.* § 211. Potter Anderson also filed a plenary action seeking declaratory and injunctive relief against Austin. The three actions were consolidated, and Potter Anderson moved for summary judgment on its claims for relief under Sections 220 and 211.

During a hearing on September 29, 2009, Chancellor Chandler granted summary judgment on the Section 220 and Section 211 issues. He ordered production of the books and records and directed that a meeting of stockholders be held on December 9, 2009.

### B.   The Court Appoints a Receiver.

The December 2009 meeting was not to be. In preparation for the Court-ordered meeting, Preferred produced a list of stockholders to which Judy objected. Potter Anderson then sought the appointment of a receiver to determine which stockholders could vote at the meeting. During a hearing on December 4, 2009, Chancellor Chandler deferred the annual meeting and appointed Richard L. Renck, Esq., as receiver.

The receiver filed a thorough, lengthy, and detailed report on March 5, 2010. Many of the receiver's conclusions turned on assessments of incomplete and conflicting corporate records. It was clear that multiple parties, including Judy, would object to various aspects of the report and that a trial would be needed to resolve the persistent disputes about who could vote at the Court-ordered meeting.

### C.   The March 2010 Engagement Letter

By March 2010, Judy and PSI had fallen behind in their payment obligations to Potter Anderson. Facing the prospect of a significant litigation commitment going forward, Potter Anderson asked Judy and PSI to execute an updated and confirmatory engagement letter (the "March 2010

Engagement Letter"). They did. In addition, over the next several months, other members of PSI retained Potter Anderson with respect to their rights vis-à-vis Preferred, and each signed an addendum agreeing to be bound by the March 2010 Engagement Letter.

Between March and April 2010, Judy and other investors in Preferred filed an assortment of objections to the receiver's report. Chancellor Chandler scheduled a three-day trial to resolve the objections for July 6–8, 2010. The parties embarked in earnest on discovery and other pre-trial preparations.

### D.   Potter Anderson Secures The Disputed Documents.

In April 2010, Potter Anderson served discovery requests on the Company and Austin. Among other things, the requests sought copies of the Company's corporate records. The Company and Austin refused to produce any documents, contending that the receiver had possession of all documents that the Company and Austin intended to produce. In an effort to secure documents from other sources, Potter Anderson moved for commissions to obtain corporate documents from Hallett & Perrin, P.C., the Company's former corporate and securities counsel, and Robert Forrester, its counsel before Hallett & Perrin. The Company and Austin objected to the commissions. The parties crossed swords via motions to compel and for protective order. By letter decision dated June 11, 2010, Chancellor Chandler ordered the Company and Austin to produce the documents and overruled the objections to commissions.

On June 22, 2010, counsel to the Company and Austin advised Potter Anderson that there were original documents responsive to the discovery requests at a

storage facility in Texas. Defense counsel suggested that Potter Anderson could look at the materials while in Texas for a previously scheduled deposition or have the documents brought to the deposition site. One June 23, defense counsel made available to Potter Anderson at the deposition location over 35 boxes of original Company documents. Potter Anderson took custody of the documents and shipped them to its Delaware office. None of the documents had been Bates stamped, and Potter Anderson undertook the tasks of processing and reviewing the documents.

In part because of the documents produced as a result of the Court's July 11 order, the parties asked for a continuance. Trial was rescheduled for October 11–13, 2010. Later in July, Chancellor Chandler learned that the receiver had not been paid and that there was a dispute over how payment would be handled. In September, the Chancellor advised the parties that he would not proceed with trial until the receiver was paid.

### E. Potter Anderson's Payment Problems

By the end of 2010, Judy and PSI had fallen behind by over two months in their payments to Potter Anderson, and the firm anticipated ongoing litigation in 2011. Potter Anderson advised Judy and PSI in writing that it could not continue to provide legal services unless (i) the firm received a substantial payment on the past due amounts, (ii) the clients committed to a payment plan, and (iii) the clients undertook to pay future invoices in a timely manner. After negotiations, Potter Anderson, Judy, and PSI entered into an agreement dated January 7, 2011, pursuant to which Potter Anderson agreed to forego a portion of its outstanding fees, and Judy and PSI agreed to pay off the balance on a specified schedule and satisfy all future invoices within thirty days of receipt (the "January 2011 Agreement").

Based on the January 2011 Agreement, Potter Anderson continued its representation. Unfortunately, although Judy and PSI initially made certain payments, Potter Anderson did not receive any payments after January 2011.

In March 2011, in part due to unpaid bills, Potter Anderson moved to withdraw. Chancellor Chandler granted the motion on March 16.

Potter Anderson and its former clients have been unable to resolve their fee dispute. On July 15, 2011, Potter Anderson initiated arbitration proceedings and asserted an attorneys' retaining lien over its files, including the 35 boxes of documents secured through its litigation efforts.

On July 22, 2011, Judy served a subpoena on Potter Anderson seeking the original documents that Potter Anderson obtained from the defendants and third parties. Potter Anderson objected to the subpoena, citing its retaining lien. Judy moved to enforce the subpoena and compel the production of documents.

## II.  LEGAL ANALYSIS

■■■ "An attorney's retaining lien is the right of an attorney to detain possession of his client's property acquired in the course of rendering professional services." *Eagle Poultry Co. v. Camden Fire Ins. Ass'n*, 1963 WL 64648, at \*1 (Del.Ch. July 18, 1963). The lien extends to "documents, money or other property in [the attorney's] possession belonging to his client which [the attorney] acquired in the course of his professional relationship." *Royal Ins. Co. v. Simon*, 174 A. 444, 446 (Del.Ch. 1934). It is "a common-law lien, which has its origin in the inherent power of courts over the relations between attorneys and their clients." *Everett, Clarke & Benedict*

*v. Alpha Portland Cement Co.,* 225 F. 931, 935 (2d Cir.1915). English courts recognized the retaining lien in the 1700s, and the United States Supreme Court acknowledged it in the 1870s. *See id.* at 935–36 (citing *McPherson v. Cox,* 96 U.S. 404, 24 L.Ed. 746 (1877); *Wilkins v. Carmichael,* 1 Doug. 101 (1779); and *Ex Parte Bush,* 7 Viner's Abr. 74, 22 Eng. Rep. 93 (Ch. 1734)); *see also In re Paschal,* 77 U.S. (10 Wall.) 483, 488, 19 L.Ed. 992 (1870) (noting that attorneys have a general lien "upon all the papers and documents of their clients in their possession").

"Retaining liens are widely accepted in the United States, and have been compared to mechanic's or artisan's liens. Lawyers are merely afforded the same advantage enjoyed by workmen who labor on behalf of others." *Bennett v. NSR, Inc.,* 553 N.E.2d 881, 882 (Ind.Ct.App. 1990) (footnote omitted). The Restatement (Second) of Agency treats the attorney's lien as a specific application of the general principle that an agent has a right to retain money, goods, or documents of the principal to secure payment of the agent's compensation:

Unless he undertakes duties inconsistent with such a right or otherwise agrees that it is not to exist:

(a) an agent has a right to retain possession of money, goods, or documents of the principal, of which he has gained possession in the proper execution of his agency, until he is paid the amount due him from the principal as compensation for services performed or as indemnity for money advanced or liability incurred by him in connection with such things;

(b) a factor, banker, or attorney-at-law has the further right to retain possession of money, goods, or documents until he is paid the amount due him upon the general balance of accounts created by transactions conducted by him as such factor, banker, or attorney....

Restatement (Second) of Agency § 464 (1958 & Supp.2011).[1] The Restatement of Security recognizes a general possessory lien in favor of "an attorney at law, as security for the general balance due him for professional services and disbursements, upon the papers and other chattels of his client, which come into his possession in his professional capacity." Restatement of Security § 62 (1941 & Supp. 2011). Comment (i) explains that this rule is "in accordance with the Restatement of Agency § 464(b)." *Id.*

"The value of the attorney's retaining lien is principally in the leverage which it gives the attorney over a client who fails or refuses to pay for services rendered, through the embarrassment and inconvenience caused the client by withholding papers, documents, and other valuables...." L.S. Tellier, Annotation, *Rights and Remedies of Client as Regards Papers and Documents on Which Attorney Has Retaining Lien,* 3 A.L.R.2d 148, § 2 (1949). "While such a lien has no intrinsic value, it is an extremely valuable tool, because of the inconvenience caused to the client by withholding his property. If the client does not need the files' contents, the attorney will probably not be paid through assertion of the lien." Timothy J. Segers, Comment, *Control of Client Files When Fees are Unpaid,* 18 J. Legal Prof. 357, 357–58 (1993) (footnote omitted). "The retaining lien is only as valuable as the documents

---

1. The Restatement (Third) of Agency does not contain a comparable section or otherwise discuss retaining liens.

possessed by the attorney and the inconvenience caused to the client by the attorney's retention." *Bennett*, 553 N.E.2d at 882; *see Brauer v. Hotel Assocs.*, 40 N.J. 415, 192 A.2d 831, 835 (1963) ("The focal point is not upon the objective worth of the property, but upon its subjective worth to the client and those who represent him. If the property loses this latter value, the attorney's possession becomes meaningless, and his passive lien, to all effects, worthless.").

■ The right of an attorney to assert a retaining lien and inconvenience his former client by keeping his file contrasts sharply with the ethical obligations of an attorney to provide the former client with his file and act reasonably to protect the interests of the former client. Rule 1.16(d) of the Delaware Lawyers' Rules of Professional Conduct provides that

> [u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred.

Del. Lawyers' Rules of Prof'l Conduct R. 1.16(d). *See In re Carmine*, 559 A.2d 248, 251–52 (Del.1989) (finding that an attorney violated Rule 1.16(d) by "fail[ing] to surrender his file to [successor counsel] on numerous occasions"); *In re Higgins*, 565 A.2d 901, 903–07 (Del.1989) (finding that attorney "failed to surrender papers and property to which his client was entitled upon termination of representation in violation of [Rule] 1.16(d)"). Comment 9 to Rule 1.16(d) notes that "[e]ven if the lawyer has been unfairly discharged by the client, a lawyer must take all reasonable steps to mitigate the consequences to the

client." Del. Lawyers' Rules of Prof'l Conduct R. 1.16(d) cmt. 9. As the United States District Court for the Northern District of Illinois observed when considering a challenge to a retaining lien,

> We are therefore faced with a direct conflict between two well-established principles: An attorney *may* hold a client's property under an attorney's retaining lien, but a client *should* have his property returned to him when his attorney withdraws. Although both principles are well established, neither is absolute. Both are judicial devices, the former for the protection of the attorney, the latter for the protection of the client.

*Lucky–Goldstar Int'l, Inc. v. Int'l Mfg. Sales Co.*, 636 F.Supp. 1059, 1062–63 (N.D.Ill.1986) (citation omitted).

■ The retaining lien also potentially conflicts with "an equally important third interest—effective judicial administration." *Id.* at 1063.

> Both the court and the former client have an obligation to make sure the lawsuit proceeds in a fair and reasonable manner. A disgruntled attorney does not have the right to disrupt a court's calendar and frustrate their former client's chances of success, nor is a disgruntled client justified in not paying an attorney a reasonable fee for services rendered.

*Carrizales v. Bd. of Educ.*, 2004 WL 2385028, at *2 (N.D.Ill. Oct. 22, 2004). "The conflict between the withdrawn attorney and the former client should not be allowed to delay the underlying action." *Lucky–Goldstar*, 636 F.Supp. at 1063. At the same time, "[i]n attempting to move the underlying action forward and accommodate these competing interests, the court should not interfere unnecessarily in the dispute between the lawyer and client." *Id.* That dispute should be resolved

in the proper forum, which often will not be the court addressing the lien. *See id.* Here, the parties' fee dispute will be resolved in the arbitration that Potter Anderson initiated in July 2011.

■ Confronted with these competing interests, the vast majority of courts have upheld attorney retaining liens, but crafted a host of bright-line and near bright-line exceptions to their enforcement. The resulting thicket of decisions conflicts on numerous points.[2] A minority of jurisdictions have rejected or dramatically limited the circumstances under which an attorneys' retaining lien can be asserted.[3] Other (and in my view better reasoned) decisions openly recognize the need for balancing.[4] Most prominently, in *Lucky–Goldstar*, the United States District Court for the Northern District of Illinois applied a balancing test using factors identified by the American Bar Association's

**2.** *See* Thomas G. Fischer, Annotation, *Attorney's Retaining Lien: What Items of Client's Property or Funds Are Not Subject to Lien*, 70 A.L.R.4th 827 (1989 & Supp.) (collecting cases); Thomas G. Fischer, Annotation, *Attorney's Assertion of Retaining Lien as Violation of Ethical Code or Rules Governing Professional Conduct*, 69 A.L.R.4th 974 (1989 & Supp.) (same); *see also* ABA/BNA Lawyers' Manual on Professional Conduct § 31:1211 at 13 (2006) ("Courts and ethics committees have struggled with crafting a bright-line rule as to when withholding client property will impermissibly prejudice the client's case."); Arthur Garwin, *Trading Files for Fees*, 90 ABA J. 24, 24 (Jan.2004) (noting conflicts and observing that "the decisions offer little certainty as to the circumstances under which the client's right to the papers exceeds the lawyer's right to use the papers as a vehicle to get paid"); Note, *Attorney's Retaining Lien Over Former Client's Papers*, 65 Colum. L.Rev. 296, 296 (1965) (criticizing lien jurisprudence as exhibiting "the inconsistency of *ad hoc* judicial decision").

**3.** *See, e.g., Resolution Trust Corp. v. H——, P.C.*, 128 F.R.D. 647, 648–50 (N.D.Tex.1989) (holding that under Texas law the attorney's file belongs to client and must be transferred); *Acad. of Cal. Optometrists, Inc. v. Super. Ct.*, 51 Cal.App.3d 999, 124 Cal.Rptr. 668 (1975) (finding that asserting a retaining lien was unethical where the matter handled by the withdrawing attorney was still in litigation and an important trial deadline was approaching); Disciplinary Bd. of the Haw. Sup.Ct., Formal Op. No. 28 (1983, updated 2001) (opining that retaining lien would violate spirit and intent of Rule 1.16(d) in withdrawal cases); State Bar of Wis., Comm. on Prof'l Ethics, Formal Op. E–95–4 (1995) (opining that retaining lien cannot be asserted ethically in Wisconsin). The Restatement

(Third) of the Law Governing Lawyers recommends the minority position in which an attorney retaining lien is inconsistent with the attorney's duties to his client. *See* Restatement (Third) of the Law Governing Lawyers § 43(1) (2000 & Supp.2011) ("Except as provided [pursuant to a contractual charging lien drafted in accordance with] Subsection (2) or by statute or rule, a lawyer does not acquire a lien entitling the lawyer to retain the client's property in the lawyer's possession in order to secure payment of the lawyer's fees and disbursements."); *id.* cmt. a ("This Section thus does not recognize retaining liens on the client's documents except as provided by statute or rule ...."); *see also* John Leubsdorf, *Against Lawyer Retaining Liens*, 72 Fordham L.Rev. 849 (2004) (urging the abolition of the retaining lien; authored by Associate Reporter for the Restatement of the Law Governing Lawyers and primary drafter of its treatment of attorney liens).

**4.** *See, e.g., Johnson v. Cherry*, 422 F.3d 540, 555 (7th Cir.2005) (vacating order overruling lien and remanding for "balancing of the respective rights of [attorney] and [client]"); *Lucky–Goldstar*, 636 F.Supp. at 1063–65 (applying multi-factor balancing test); *Nat'l Sales & Serv. Co. v. Super. Ct.*, 136 Ariz. 544, 667 P.2d 738, 740 (1983) (identifying theoretical extremes when lien would be valid or invalid, then observing that "this case falls in that area between the extremes where the inquiry must be particularized to the individual documents demanded by the client and the details of the procedural posture of the case"); *see also* Kathleen D. Britton, Commentary, *Attorneys' Retaining Liens*, 6 J. Legal Prof. 263, 276 (1981) ("[B]alancing of the interests seems to underly the decisions of many courts.").

Standing Committee on Ethics and Professional Responsibility (the "ABA Committee"). *See* 636 F.Supp. at 1063–64.[5]

In Informal Opinion 1461, the ABA Committee responded to a question posed by a lawyer who agreed to represent an impecunious client in a divorce, who negotiated and drafted a stipulation and agreement with the former spouse, and who obtained the former spouse's signature on the document, but who never received payment from his client beyond an initial $50. The lawyer asked "whether, consistent with the Model Code of Professional Responsibility, he can withhold the partly signed stipulation and agreement in order to place leverage on the client to pay the fee or at least part of it." ABA Comm. on Ethics and Prof'l Responsibility, Informal Op. 1461 (1980), *reprinted in* Formal & Informal Ethics Ops. 374, 374 (1985). The ABA Committee first noted that "[a] client's legal entitlement to papers, money or other property in the lawyer's possession, and the right of the lawyer to impose an attorney's lien on those papers or property are, of course, matters of state law beyond the jurisdiction of the Committee." *Id.* The ABA Committee then cautioned that "[a] proper sense of regard for the nature of the profession, and for the Model Code provisions . . . , should lead a lawyer to evaluate his financial interests in light of the interests of the client when he is making a decision to invoke an attorney's lien to which he may be entitled under law." *Id.* at 375. After noting that the ethical rules exhort lawyers to forego their legal right to sue a client for a fee "unless necessary to prevent fraud or gross imposition by the client," the ABA Committee concluded that "the same standard should

be applied in determining whether or not to exercise an attorney's lien." *Id.* at 376 (internal quotation marks omitted). The ABA Committee then identified seven factors for a lawyer to consider when analyzing the "fraud or gross imposition" standard:

> the financial situation of the client, the sophistication of the client in dealing with lawyers, whether the fee is reasonable, whether the client clearly understood and agreed to pay the amount now owing, whether imposition of the retaining lien would prejudice important rights or interests of the client or of other parties, whether failure to impose the lien would result in fraud or gross imposition by the client, and whether there are less stringent means by which the matter can be resolved or by which the amount owing can be secured.

*Id.*

Having identified these factors, the ABA Committee offered concise suggestions as to how they might balance out:

> If, for example, exercise of the retaining lien would prejudice the client's ability to defend against a criminal charge, or to assert or defend a similarly important personal liberty, the lawyer should ordinarily forego the lien. Similarly, if the court, or other parties, or the public interest would be adversely and seriously affected by the lien, the lawyer should be hesitant to invoke it. Financial inability of the client to pay the amount owing should also cause the lawyer to forego the lien because the failure to pay the fee is not deliberate and thus does not constitute fraud or gross imposition

---

5. For examples of cases following *Lucky–Goldstar*, see *Carrizales*, 2004 WL 2385028, at *2, *Rubel v. Brimacombe & Schlecte, P.C.*, 86 B.R. 81, 85 (E.D.Mich.1988), and *Jernryd v. Nilsson*, 117 F.R.D. 416, 417 (N.D.Ill.1987).

See also Anthony W. Overholt, *Retaining the Retaining Lien After In Re Gemmer*, 36 Res Gestae 110, 114 (1992) (describing *Lucky–Goldstar* as a "well reasoned case").

by the client. The lawyer should forego the lien if he knew of the client's financial inability at the beginning or if he failed to assure agreement as to the amount or method of calculating the fee.

Assertion of the lien would be ethically justified when the client is financially able but deliberately refuses to pay a fee that was clearly agreed upon and is due, since this conduct would constitute gross imposition by the client.

*Id.* The ABA Committee ultimately did not answer the specific question posed by the attorney, leaving the matter to the lawyer's "sound discretion." *Id.*

Delaware courts have yet to consider the myriad issues raised by attorney retaining liens. Only three Delaware cases mention the lien—the *Eagle Poultry* and *Royal Insurance* cases, cited above, and *Polin v. Delmarva Poultry Corp.*, 188 A.2d 364 (Del.Super.1963). Each opinion merely describes it in passing. *See Eagle Poultry*, 1963 WL 64648, at *1; *Polin*, 188 A.2d at 365; *Royal Ins.*, 174 A. at 446. None delves into the parameters of the lien or considers the conflicting interests involved in its application to particular facts.

Delaware's only other nod to retaining liens appears in Rule 1.16(d) of the Delaware Rules of Professional Conduct, which replicates Model Rule of Professional Conduct 1.16(d) *in haec verba*. Like the Delaware cases, Rule 1.16(d) makes only passing reference to a retaining lien and avoids using the term. It states: "Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as . . . surrendering papers and property to which the client is entitled. . . . *The lawyer may retain papers relating to the client to the extent permitted by other law.*" Del. Lawyers' Rules of Prof'l Conduct R. 1.16(d) (emphasis added). Comment 9 to the Delaware Rule, which is identical to

Comment 9 to the Model Rule, cautions: "Even if the lawyer has been unfairly discharged by the client, a lawyer must take all reasonable steps to mitigate the consequences to the client. *The lawyer may retain papers as security for a fee only to the extent permitted by law.*" *Id.* at cmt. 9 (emphasis added). Rule 1.16(d) thus acknowledges the possibility of a lien but does not provide any guidance about when, how, and to what degree a lawyer might assert it.

■ From these limited authorities, I can glean that Delaware recognizes attorney retaining liens, but not much else. In my view, a multi-factor balancing approach like that followed in *Lucky–Goldstar* best allows a court to gauge when and to what degree an attorney's retaining lien should be respected. After engaging in a fact-specific balancing of interests, a court can take into account the competing interests of the attorney, the client, and the judicial system, determine whether the lien should be enforced in whole or part, and evaluate whether the partial or complete release of the lien should be conditioned on the client providing alternative security. On the facts of this case, balancing the interests calls for granting the motion to compel and requiring Potter Anderson to release its lien conditioned on Judy posting adequate security.

I start with the relative interests of Potter Anderson and Judy in the disputed documents. Judy argues that Potter Anderson has no legitimate interest in the original documents it holds because those documents comprise Preferred's corporate records and therefore are not property of Potter Anderson's client. Descriptions of the attorney retaining lien, whether the brief references in the Delaware cases or lengthier descriptions from other jurisdictions or treatises, universally refer in various forms to an attorney's right to retain

documents and other property "belonging to" the former client.[6] Judy asserts that a bright-line rule bars an attorney from asserting a retaining lien unless the client holds title to the disputed property.

■ Judy forgets that our legal system long ago moved beyond conceiving ownership as unitary and indivisible. Multiple parties may hold differing interests in an asset with relative priorities and rights. An attorney's right to retain property cannot rise higher than the client's interest in the property, but the fact that another has a superior right to the property does not prevent the attorney from asserting his lien against the client. The third party with a superior right can obtain the property from the attorney, just as from the client, but this does not alter the relative priority as between attorney and client. An English decision from 1813, relied on by the Second Circuit in *Everett, Clarke & Benedict,* illustrates the concept with an analogy:

> Suppose one having a diamond, offers it to another for sale for 100£ and gives it him to examine, and he takes it to a jeweler, who weighs and values it; he refuses to purchase, and being asked for

it again, he says, the jeweler, must be first paid for the valuation; as between the jeweler and purchaser, the jeweler has a lien; but as against the lender, he has no right to retain the jewel....

*Hollis v. Claridge,* 4 Taunt. 807, 810, 128 Eng. Rep. 549 (Ct.Com.Pl.1813) (Gibbs, J.), *quoted in Everett, Clarke & Benedict,* 225 F. at 938.

Judy and Potter Anderson became entitled to possess Preferred's original corporate records when Preferred produced them in response to Chancellor Chandler's order. As between Preferred on the one hand and Judy on the other, Preferred holds the superior interest. Like the lender in the *Hollis* example, Preferred readily could insist upon their return. Preferred, however, has not sought the documents. Judy has, and Judy is Potter Anderson's former client. Just as the jeweler could assert a lien against the prospective purchaser, Potter Anderson can invoke its lien against Judy. The disputed documents are discovery materials that came into Potter Anderson's possession by virtue of the firm rendering legal services to Judy. Potter Anderson therefore has a protectable interest in the materials,[7] and that interest

---

6. *See, e.g., Eagle Poultry,* 1963 WL 64648, at *1 ("An attorney's retaining lien is the right of an attorney to detain possession of *his client's property* acquired in the course of rendering professional services." (emphasis added)); *Royal Ins.,* 174 A. at 446 (describing lien as extending to "documents, money or other property in [the attorney's] possession *belonging to his client*" (emphasis added)); *Lucky–Goldstar,* 636 F.Supp. at 1062 ("We are therefore faced with a direct conflict between two well-established principles: An attorney *may* hold *a client's property* under an attorney's retaining lien, but a client *should* have his property returned to him when his attorney withdraws." (second emphasis added)); 7 Am.Jur.2d Attorneys at Law § 310 (2011) ("A general or retaining lien entitles an attorney, if discharged by the client, to retain *the client's papers, property or money* until a

court, at the request of the client, requires the attorney to deliver the retained items upon the client's furnishing of payment or security for the attorney's fees." (emphasis added)); Tellier, *supra,* 3 A.L.R.2d 148, at § 1 ("[A retaining lien,] which is generally a common-law lien, attaches to all property, papers, books, documents, securities, and moneys *of the client* coming into the hands of the attorney in the course of his professional employment ...." (emphasis added)).

7. *See, e.g., Rivkin v. A.J. Hollander & Co.,* 1996 WL 633217, at *1, *4 n. 1 (S.D.N.Y. Nov. 1, 1996) (enforcing retaining lien on discovery material); *Shelowitz, Shelowitz, Terrell & Coffey, P.A. v. Peters,* 931 So.2d 1059, 1060 (Fla.Dist.Ct.App.2006) (per curiam) (quashing order compelling attorney to produce discovery materials, finding they were

must be balanced against the competing interests of Judy and the judicial system in having access to the documents for purposes of on-going litigation.

I now turn to the *Lucky–Goldstar* factors, which start with the financial situation of the client. Because attorneys are not immune to financial difficulties, and because a client could take advantage of a law firm's distress or over-investment in a matter, I broaden this factor to consider the financial situations of both client and counsel.

In this case, neither side has identified any particular financial difficulties. Judy and PSI have not suggested that they cannot pay or are *in extremis*. To the contrary, they have engaged multiple other law firms both within and outside of Delaware. In addition to their own fees, Judy and PSI are also paying the legal fees of *all other objectors* in this litigation, with the exception of Preferred Investors Association. For its part, while Potter Anderson does not appear to be in financial distress, the firm understandably would like to collect a receivable in the vicinity of half a million dollars. That is already a discounted amount, because Potter Anderson wrote off a portion of its fees as part of the January 2011 Agreement. Because it appears that Judy could pay

and has simply chosen not to, the first factor favors upholding Potter Anderson's lien. *See, e.g., Johnson*, 422 F.3d at 556 (vacating district court order overruling lien where, among other things, the client had not "presented evidence that she lacks the means either to pay [the attorney's] reasonable fees and expenses or to post adequate security").

The second *Lucky–Goldstar* factor calls for evaluating the sophistication of the client in dealing with lawyers. Judy is clearly sophisticated and knowledgeable in this regard. During all stages of Potter Anderson's representation, Judy simultaneously consulted with other lawyers, and Potter Anderson has interacted with at least four law firms located in Washington, D.C., all retained by Judy and PSI. Judy is funding all but one of the other objectors in this proceeding, each of whom retained separate counsel. In February 2009, Judy formed his co-client, PSI, to provide a vehicle for accredited investors in Preferred to coordinate their efforts. That step alone reveals his sophistication. Judy's familiarity with lawyers and the legal process favors maintaining the Potter Anderson lien.

The third and fourth *Lucky–Goldstar* factors examine whether the disputed fee

subject to retaining lien); *see also Johnson*, 422 F.3d at 555 ("The retaining lien is a common-law lien that attaches to documents or other property that come into the attorney's possession in the course of her professional relationship with the client."); *Jersey Land & Dev. Corp. v. United States*, 342 F.Supp. 48, 52–53 (D.N.J.1972) ("[A] retaining lien attaches to all papers, books, documents, etc., which came into [the attorney's] possession by virtue of his legal services in representing [the client]."); Restatement (Second) of Agency § 464 cmt. d ("If there is no agreement otherwise, an agent who has received goods or documents as a result of the proper execution of his agency has a lien upon them for amounts due from the principal because of his agency with regard to the particular subject matter."); Anthony W. Overholt, *Retaining the Retaining Lien After* In Re Gemmer, 36 Res Gestae 110, 110 (1992) ("The retaining lien has been held to attach to not only papers and property given to the attorney, but to most of the attorney's work product and documents prepared or secured by the attorney in his or her preparation of the litigation."); Kathleen D. Britton, Commentary, *Attorneys' Retaining Liens*, 6 J. Legal Prof. 263, 263 (1981) ("An attorney ... may assert a retaining lien on all papers, books, documents, money and other property which have come into his hands in the course of professional employment by the client.").

is reasonable and whether the client clearly understood and agreed to pay the amount owed. Judy and PSI's fee arrangement with Potter Anderson is governed by a combination of the March 2010 Engagement Letter and the January 2011 Agreement. In the March 2010 Engagement Letter, Judy and PSI re-affirmed their obligations to Potter Anderson. In the January 2011 Agreement, Judy and PSI extracted a write-off from Potter Anderson, agreed to pay the discounted amount according to a payment schedule, and undertook to pay future invoices within thirty days. Judy drafted the January 2011 Agreement and negotiated its terms directly with Potter Anderson. There can be no question that Judy and PSI clearly understood and agreed to pay the outstanding amounts. The arms' length bargaining over the compromise memorialized by the January 2011 Agreement provides strong evidence that the resulting terms are reasonable. The third and fourth factors favor Potter Anderson.

The fifth *Lucky–Goldstar* factor asks whether imposition of the retaining lien would prejudice important rights or interests of the client or other parties. There is inherently some prejudice to Judy and other litigants from enforcing the retaining lien. As noted, a retaining lien functions by imposing some degree of inconvenience on the former client. This is not a case, however, where the resulting inconvenience is disproportionate or unfairly prejudicial, such as where upholding the lien would interfere with the client's ability to defend against a criminal charge or protect a similarly important liberty interest. *See Lucky–Goldstar*, 636 F.Supp. at 1062–64. As Judy describes it, the merits claims in this action seek "a determination of the identity of the Company's stockholders, warrant holders and note holders; the validity and entire fairness of Mr. Austin's issuance of 800,000 shares of common stock to himself; and the validity of the 2007 Reorganization of the Company." Mot. to Compel ¶ 12. In other words, this is a civil dispute over economic interests in a privately held entity. Although the Court regards every matter on its docket as significant, and the case has obvious importance to the parties, the litigation has now been pending for over two years. No external deadline or upcoming event has been identified that would require an expedited decision or otherwise prevent the Court from modifying the case schedule (if warranted) to protect all parties' rights. There accordingly is no risk of disproportionate inconvenience or unfair prejudice that would merit overriding Potter Anderson's lien.

I now jump to the seventh *Lucky–Goldstar* factor, which asks "whether there are less stringent means by which the matter can be resolved or by which the amount owing can be secured"? The attorney's interest protected by the retaining lien is a pecuniary interest in payment. Courts now commonly resolve the competing interests of attorney, client, and judicial system by requiring the production of the case file conditioned on the client posting alternative security to protect the lawyer's pecuniary interest.[8] To my mind, this

---

8. *See, e.g., The Flush*, 277 F. 25, 29–31 (2d Cir.1921) (upholding retaining lien by conditioning former client's access to discharged attorney's file on former client paying or providing security for discharged attorney's fee); *Bennett*, 553 N.E.2d at 883 ("The best reasoned cases we have found require the attorney to relinquish possession and control of the property subject to the retaining lien, but protect him with proper security for the compensation claimed."); ABA/BNA Lawyers' Manual on Professional Conduct § 31:1212 at 14 (2006) ("A number of courts have resolved the tension between preventing prejudice to the client and preserving the lawyer's right to compensation by ordering the lawyer to give

*Lucky–Goldstar* factor predominantly turns on whether the posting of security can protect adequately the attorney's pecuniary interest and, if so, what form and amount of security is warranted.

Different factual scenarios will affect whether the posting of security provides a solution. The financial pressures facing the attorney and client necessarily re-enter the analysis. If the client is impecunious, then the retaining lien may have little practical value, and it could be appropriate to require only a fraction of the amount as security. *See New World Mktg. Corp. v. Garcia*, 76 B.R. 68, 69 (E.D.Pa.1987) ("Given a client in bankruptcy, with no likelihood of distribution to unsecured creditors, the lien asserted by [the law firm] does not represent a significant property interest."). If the attorney and former client can obtain a prompt decision on the merits of their dispute, then the attorney may have less need for the lien's protection and potentially could make due without it or with security for only a portion of the disputed amount. The justification for a retaining lien might also be undermined or non-existent if the attorney pursued the case on contingency or with the expectation of being compensated through fee-shifting at the end of the case. *See, e.g. Misek–Falkoff v. Int'l Bus. Machs. Corp.*, 829 F.Supp. 660, 664 (S.D.N.Y.1993) (overruling retaining lien in part because litigation was brought with expectation that counsel would obtain compensation under fee-shifting provisions of federal law).

After considering this *Lucky–Goldstar* factor, I conclude that requiring Judy and PSI to post security will protect adequately Potter Anderson's pecuniary interest. As to the amount of security, Potter Anderson undertook the representation expecting to be paid on a monthly basis, and the January 2011 Agreement confirmed the payment terms, established a fixed amount due, and set up a payment schedule. The circumstances suggest that Judy agreed to pay the January amount then reneged, likely hoping that Potter Anderson would take a further write-off rather than incurring incremental costs, losing the time value of money, and suffering the distraction of a collection action. These facts support requiring security equal to the full amount of the agreed-upon but unpaid fee. At the same time, Potter Anderson recently initiated an arbitration to resolve the fee dispute and presumably will obtain a relatively prompt result, a fact that reduces to some degree Potter Anderson's need for full security. Under the circumstances, I likely would require Judy to post security equal to 100% of the outstanding fees or at most apply a small discount. Potter Anderson has responsibly requested only 70%, less than what I would impose, and I therefore adopt Potter Anderson's figure.

Finally, I decline to consider the sixth *Lucky–Goldstar* factor, which asks whether failing to impose the lien "would result in fraud or gross imposition by the client." *Lucky–Goldstar*, 636 F.Supp. at 1063. As noted, *supra*, the "fraud or gross imposition" standard derives from ABA Committee's views that as an ethical matter, a lawyer should forego her legal right to sue

up the client's property, but making surrender contingent upon the client's posting a bond or delivering some other type of security to the lawyer."); Tellier, *supra*, § 2 ("[I]t seems now to be generally recognized that a court … may, and in a proper case will, order surrender of papers and documents, upon which a retaining lien is claimed, to the client upon the giving of adequate security for payment of the attorney's claim."); *see id.* § 4[a] (collecting cases approving practice); Kathleen D. Britton, Commentary, *Attorneys' Retaining Liens*, 6 J. Legal Prof. 263, 276 (1981) ("In many of the decisions, the courts compromise by requiring that security be given to the attorney.").

a client for fees "unless necessary to prevent fraud or gross imposition by the client," and that "[t]he same standard should be applied in determining whether or not to exercise an attorney's lien." ABA Comm. on Ethics and Prof'l Responsibility, Informal Op. 1461 (1980), *reprinted in* Formal & Informal Ethics Ops. 374, 376 (1985). Although the ABA Committee reintroduced the "fraud or gross imposition" language as a factor for the attorney to consider, it is actually the ethical test that the lawyer is supposed to apply.

Although I believe that the other factors identified in Informal Opinion 1461 provide a helpful framework for balancing the competing interests of the lawyer, client, and legal system, I do not believe that Delaware law should adopt the "fraud or gross imposition" test. Delaware law maintains a careful distinction between ethical guidelines and legal rules. Our Supreme Court has held that the Delaware Lawyers' Rules of Professional Conduct

> may not be applied in extra-disciplinary proceedings solely to vindicate the legal profession's concerns in such affairs. Unless the challenged conduct prejudices the fairness of the proceedings, such that it adversely affects the fair and efficient administration of justice, only [the Delaware Supreme Court] has the power and responsibility to govern the Bar, and in pursuance of that authority to enforce the Rules for disciplinary purposes.

*In re Infotechnology*, 582 A.2d 215, 216–17 (Del.1990). In reaching this holding, the Supreme Court relied on the Scope of the Rules, which states:

Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rules. Accordingly, nothing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty.

*Id.* at 220 (quoting Del. Lawyers' Rules of Prof'l Conduct Scope). The *Infotechnology* Court concluded, "Thus, it is clear that even though lawyers have substantive legal duties, which may be congruent with the requirements and objectives of the Rules, the latter provide no additional bases for the enforcement of such duties outside of the framework of disciplinary proceedings." *Id.*

The question for this Court to decide is not whether Potter Anderson acted ethically, but rather whether the motion to compel should be granted. The latter poses a question of law which the ABA Committee considers to be beyond its jurisdiction.[9]

9. *See* ABA Comm. on Ethics and Prof'l Responsibility, Informal Op. 1461, (1980), *reprinted in* Formal & Informal Ethics Ops. 374, 374 (1985). ("A client's legal entitlement to papers, money or other property in the lawyer's possession, and the right of the

lawyer to impose an attorney's lien on those papers or property are, of course, matters of state law beyond the jurisdiction of the Committee."); ABA Comm. on Ethics and Prof'l Responsibility, Informal Op. 1376 (1977), *reprinted in* Formal & Informal Ethics Ops.

■ In my view, an approach in which courts overrule retaining liens "unless necessary to prevent fraud or gross imposition by the client" skews the balancing by assuming that any dispute in which a law firm asserts a retaining lien inherently pits an attorney with leverage against a client without recourse. Law firms and clients come in all shapes and sizes. A law firm could be a solo practitioner, a small shop, a large firm, or a multi-national colossus. Clients similarly range from underprivileged individuals to Fortune 100 corporations. Different mixes produce different equities. Either the attorney or the client might be under financial strain, and both sides have cards to pay. The attorney has her retaining lien, perhaps a charging lien, and the (often unpalatable) option of suing for fees. The client holds the money and can threaten a malpractice suit, disciplinary complaint, or other actions that would harm the attorney's reputation and ability to practice. As a concurring justice of the Arizona Supreme Court explained when considering an appeal challenging a trial court's order upholding a retaining lien,

> Unfortunately, there are occasions when some lawyers seek to take advantage of clients, but there are also many instances where clients seek to take advantage of lawyers or where the assertion of [a retaining] lien is fair and proper and does not violate ethical obligations. In those situations I think it not too much to expect that lawyers should have the same right to a possessory lien as that which is possessed by factors, bankers, and other professions. In addition, lawyers should be entitled to assert the same protection by reason of a possessory lien as are others when a client has become insolvent, has taken the benefit of a bankruptcy proceeding, has made

an assignment for the benefit of creditors[,] or has had a receiver appointed.

*Nat'l Sales,* 667 P.2d at 742 (Feldman, J., concurring).

Consistent with *Infotechnology,* I do not believe that an ethics standard—"fraud and or gross imposition by the client"—should govern the legal question of whether a retaining lien can be maintained. In my view, the other six *Lucky–Goldstar* factors appropriately and sufficiently guide the analysis. Having considered those six factors, I conclude that the motion to compel should be granted, conditioned on Judy posting a bond or cash in escrow equal to 70% of Potter Anderson's disputed fees.

Finally, two other parties joined in Judy's motion to compel, but their involvement does not affect the outcome. Jeffery Gast joined in Judy's motion "on behalf of himself and as representative of holders of warrants exercisable for stock in [Preferred]." Dkt. 234. Gast relied entirely on Judy's papers and did not offer any argument as to why his status as a warrant holder might lead to a different result.

Kenneth W. Fry similarly joined in Judy's motion, but also contends separately that the documents should be produced so they can be used in litigation Fry brought on behalf of former holders of certain licenses acquired by Preferred. Fry cites a stipulation and order permitting all discovery material in this action to be used as if produced in Fry's action.

The Fry action appears to be riding the coattails of this proceeding. No schedule has been entered in the Fry action, and there are no upcoming hearing dates. The last activity on the docket is Chancellor

261, 263 (1985) ("Whether the lawyer may retain the file pending payment is a question of law. The law in respect to a lawyer's right

to a lien varies from jurisdiction to jurisdiction. The Committee is accordingly unable to advise.").

Chandler's letter dated May 27, 2011, reassigning the case to me. That was the same date that the stipulation on the use of discovery material was granted. The last activity before that was in February 2011, when Chancellor Chandler approved a stipulation and order vacating a default judgment. Fry has not pressed his case or sought discovery of his own. Nor has he identified how the disputed materials might be relevant to his action.

It appears to me that until the receiver issued his report in March 2010, a wide range of investors in Preferred were happy to have Judy and Potter Anderson lead the charge against Austin in an effort to change the status quo at Preferred. Those investors benefited from Potter Anderson's work. Even now, Judy remains the driving force behind the litigation. Having reaped the benefits of Potter Anderson's efforts, Gast and Fry are poorly positioned to override the firm's retaining lien. At best, their interests might rise to the level of Judy's, but no higher.

## III.  CONCLUSION

For the foregoing reasons, the motion to compel is granted, conditioned on Judy posting adequate security. An order has been entered consistent with this opinion.