# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KEN MCALLISTER and ELEVATUS BRAND PARTNERS, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2023-1127-CDW |
| ROBERT STIDHAM and JOE LEWIS, | ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| ELEVATUS BRAND PARTNERS, LLC, | ) ) | |
| Nominal Defendant. | ) | |
| ROBERT STIDHAM, | ) ) | |
| Counterclaim Plaintiff, | ) ) | |
| v. | ) ) ) | |
| KEN MCALLISTER, | ) ) | |
| Counterclaim Defendant. | ) | |

## REPORT GRANTING IN PART MOTION TO COMPEL COMPLIANCE WITH SUBPOENA DIRECTED TO AKERMAN LLP

Date Submitted:  October 8, 2025
Date Decided:  February 24, 2026

John G. Harris, William E. Green Jr., and Timothy S. Spangler III, HALLORAN FARKAS + KITTILA LLP, Wilmington, Delaware; *Counsel for Plaintiff and Counterclaim Defendant Ken McAllister*

Gregory W. Hauswirth, CAROTHERS & HAUSWIRTH LLP, Wilmington, Delaware; *Counsel for Defendant and Counterclaim Plaintiff Robert Stidham*

Peter Bradford deLeeuw, DELEEUW LAW LLC, Wilmington, Delaware; *Counsel for Defendant Joe Lewis*

Kathleen A. Murphy, MCCOLLUM D'EMILIO SMITH UEBLER LLC, Wilmington, Delaware; *Liquidating Trustee for Nominal Defendant Elevatus Brand Partners, LLC*

Andre S. Dupre, Brian R. Lemon, AKERMAN LLP, Wilmington, Delaware; *Counsel for Non-Party Akerman LLP*

**WRIGHT, M.**

This report resolves the Motion to Compel Compliance with Subpoena Directed to Akerman LLP ("Motion")[1] filed by the Liquidating Trustee for Nominal Defendant Elevatus Brand Partners, LLC ("Trustee"). For the reasons explained below, the court grants the Motion in part.

## I. FACTUAL BACKGROUND

On or about January 31, 2023, plaintiff Ken McAllister and defendant Robert Stidham formed Elevatus Brand Partners LLC ("Elevatus").[2] Elevatus retained Kevin Hein, Esquire of Akerman LLP ("Akerman") as its corporate counsel.[3] In November 2023, McAllister initiated these proceedings, asserting direct and derivative claims against Stidham.[4]

On September 25, 2024 the court appointed the Trustee to oversee the dissolution of Elevatus.[5] Pursuant to the Order of Dissolution and Appointment of Liquidating Trustee ("Dissolution Order"), the Trustee was appointed the "sole manager" of Elevatus and "no other person or entity" was permitted to act as manager of Elevatus.[6] This included the power to execute and prepare all

---

[1] Dkt. 101.

[2] Second Am. Verified Compl., Dkt. 164 ("Compl.") ¶ 13; Dkt. 148 ¶ 13.

[3] Mot. ¶¶ 1,14; Opp'n to Mot. to Compel Compliance with Subpoena on Non-Party Akerman LLP, Dkt. 114 ("Opp'n") ¶ 2.

[4] *See generally* Dkt. 1.

[5] Dkt. 65.

[6] Dkt. 68 ¶ 4.

documents and perform all acts "necessary and incidental" to the dissolution in the name of Elevatus, including retaining legal counsel.[7]

The Dissolution Order also directed the Trustee to "take control of all assets of [Elevatus] including, without limitation, all: entity assets of every kind and nature []whether . . . books, records, papers, documents, accounts, contract rights . . . [and] contract information . . . ."[8] This included taking necessary actions to "receive collect and review all relevant communications" addressed to Elevatus or its agents.[9]

On October 25, the Trustee contacted Akerman "requesting documentation regarding the formation and operation of [Elevatus] and its potential subsidiaries and affiliates."[10] Akerman made an initial production on November 20 and a supplemental production on December 12.[11] Akerman declined to provide any of its attorneys' "own mental impressions or internal drafts" because Elevatus had not paid Akerman for its "work product."[12]

---

[7] *Id.* ¶¶ 15.h–j.

[8] *Id.* ¶ 15.a.

[9] *Id.* ¶ 15.e.

[10] Mot. ¶ 14.

[11] *Id.* ¶ 15; Opp'n ¶ 2; Opp'n, Exs. 1–3.

[12] Opp'n, Ex. 3 (collecting cases).

Akerman also stated that it did not conduct a "forensic search" but reviewed the ordinary electronic client file.[13]

On December 19, the Trustee issued and served a subpoena on Akerman.[14] The subpoena directed Akerman to produce "[a]ll Documents and Communications" related to Elevatus and other related entities and "[a]ll engagement letters and invoices" related to Elevatus.[15] "Documents" and "Communications" are defined terms encompassing an expansive set of records.[16]

On January 17, 2025, Akerman served its responses and objections to the subpoena on the Trustee.[17] Akerman asserted objections on grounds that the subpoena was "overbroad, unduly burdensome . . . [and] lacking in reasonable scope," on the basis that Elevatus had not paid for the demanded documents, and the Trustee would not compensate Akerman for the time compiling the requested documents.[18] In the specific objections, Akerman stated that it

---

[13] *Id.* At oral argument, Akerman confirmed that this was a "Worksite" file that is organized per client. *See* Tr. of Oct. 8, 2025 Oral Arg. on Liquidating Trustee's Mot. to Compel Compliance with Subpoena Directed to Akerman LLP ("Tr.") 34–37, Dkt. 137.

[14] Subpoena *Duces Tecum* to Akerman LLP, Dkt. 71.

[15] *See id.*, Schedule A at 4.

[16] *See id.* at 1.

[17] Opp'n, Ex. 4.

[18] *Id.* ¶¶ 1, 4.

would "search and produce documents within" the Elevatus client file "upon receipt of a payment undertaking" for the search and unpaid invoices.[19]

The Trustee and Akerman began negotiating the scope of production related to the subpoena.[20] Akerman offered a compromise on the scope of production via letter dated February 24, along with a limited production of documents.[21] In its letter, Akerman reiterated its position that it was still entitled to payment or bond for the outstanding client invoices but offered to produce responsive documents that included certain search terms in the Elevatus client file.[22] Akerman asked the Trustee to advise if its proposed terms were acceptable.[23]

After receiving no response from the Trustee, Akerman made an additional production on March 11, producing records that contained the search terms it proposed in the February 24 letter.[24] The Trustee responded via letter dated March 13, maintaining that Akerman's production remained "deficient in multiple respects[.]"[25] The Trustee proposed additional search terms and

---

[19] *See, e.g., id.* ¶ 1.

[20] *See* Mot. ¶ 27, Ex. D; Opp'n ¶ 2, Exs. 5–7.

[21] Mot., Ex. D at *17–18.

[22] *Id.* at *18.

[23] *Id.*

[24] Opp'n ¶ 2, Ex. 9; *see* Mot., Ex. D at *26 (indicating Trustee's letter dated March 13 was in response to Akerman's February 24 letter and March 11 production).

[25] Mot., Ex. D at *26; Opp'n, Ex. 10 at 1.

informed Akerman that if it did not produce the records she would move to compel its compliance with the subpoena.[26]

On March 21, Akerman sent the Trustee a letter stating that it ran the additional search terms the Trustee provided and attached responsive documents.[27] Akerman concluded with its belief that it had "run all the searches requested . . . and produced all the resulting documents."[28] After this production, the Trustee did not contact Akerman to express concerns with Akerman's last production for four months.[29]

On July 28, the Trustee filed the Motion[30] and sent a copy by email to Akerman.[31] Akerman entered its appearance on August 20[32] and opposed the Motion nine days later.[33] The Trustee filed her reply on September 30.[34] On October 8, the court heard oral argument and took the Motion under advisement.[35]

---

[26] Mot., Ex. D at *30; Opp'n, Ex. 10 at 5.

[27] Mot., Ex. D at *31; Opp'n, Ex. 11 at *3.

[28] *Id.*

[29] *See* Opp'n, Ex 13 at *2.

[30] *See* Mot.

[31] Opp'n, Ex. 13 at *2.

[32] Dkt. 110.

[33] *See* Opp'n.

[34] Liquidating Trustee's Reply in Further Support of Motion to Compel Compliance with Subpoena Directed to Akerman LLP, Dkt. 129 ("Reply").

[35] Dkt. 133.

## II.     ANALYSIS

The Trustee moves to compel Akerman to respond to the subpoena under Court of Chancery Rules 21, 37, and 45.[36]  I begin by outlining the legal standard of review, then I address the substantive arguments in the Motion.  I conclude with the Trustee's request for attorney fees and costs.

### A.     The Legal Standard for Discovery From Non-Parties

Under Court of Chancery Rule 26, "parties may seek discovery 'regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action.'"  *Albertson Cos. v. Kroger Co.*, 2025 WL 2631614, at *2 (Del. Ch. Sep. 12, 2025) (quoting *New Castle Cnty. v. Christiana Town Ctr., LLC*, 2004 WL 1845103, at *4 (Del. Ch. Aug. 16, 2004)).  The scope of Rule 26 is broad and far-reaching, and relevance must be viewed liberally. *E.g.*, *In re Oxbow Carbon LLC Unitholder Litig.*, 2017 WL 959396, at *1 (Del. Ch. Mar. 13, 2017) (collecting cases).  The standard is whether the information sought "appears reasonably calculated to lead to the discovery of admissible evidence." *Christiana Town Ctr.*, 2004 WL 1845103, at *4.

The scope of discovery, though broad, is not without limit.   "The permissible scope of discovery is circumscribed by principles of relevance and proportionality." *Albertson*, 2025 WL 2631614, at *2 (citing *In re Tyson Foods,*

---

[36] Mot. ¶¶ 30, 32–34.

– 6 –

*Inc.*, 2007 WL 2685011, at *3 (Del. Ch. Sep. 11, 2007)).  A court may exercise its discretion to limit the scope of discovery where the requests are "unreasonably cumulative or duplicative[,] . . . not proportional to the needs of the case[,] . . . and the burden or expense of the proposed discovery outweighs its likely benefit."  Ct. Ch. R. 26(b)(1); *see also, e.g.*, *Tyson Foods*, 2007 WL 2685011, at *3; *Albertson*, 2025 WL 2631614, at *2.

Further, while the scope of discovery does not change when requesting documents from a non-party under Court of Chancery Rule 45, the objector's non-party status is relevant to the court's analysis.  *See Solow v. Aspect Res., LLC*, 2007 WL 3256944, at *1 (Del. Ch. Oct. 30, 2007) (citing *Van De Walle v. Unimation, Inc.*, 1983 WL 8949, at *7 (Del. Ch. Dec. 6, 1983)).  Rule 45 requires a party issuing a subpoena to take "reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena." Ct. Ch. R. 45(c)(1); *Twitter, Inc. v. Musk*, 2022 WL 4004148, at *2 (Del. Ch. Sep. 2, 2022).  The objecting parties bear the burden of establishing the subpoena is impermissible.  *See, e.g.*, *Van De Walle*, 1983 WL 8949, at *2.

## B.   The Trustee's Need for the Documents Takes Precedence Over Akerman's Retaining Lien

I now turn to the Trustee's and Akerman's substantive arguments on the Motion.  The Trustee contends that Akerman failed to comply with the subpoena by improperly asserting an attorney retaining lien on the requested

– 7 –

documents.[37]  The Trustee asks the court to order Akerman to "search for and produce the categories of documents and communications responsive to the [s]ubpoena."[38]

Akerman, on the other hand, argues it has complied with its obligations under the subpoena.  Akerman bases this position on an agreement it purportedly executed with the Trustee to satisfy her document requests in March 2025.[39]  In the alternative, Akerman argues that it is lawfully and properly asserting its retaining lien, and that it should not be ordered to produce the documents without payment or bond.[40]  Akerman also contends that producing all the documents the Trustee requests would be unduly costly and burdensome if Akerman is not compensated.[41]  Finally, Akerman opposes the Trustee's request for fee shifting.[42]

I begin by determining if the Trustee and Akerman formed an agreement. I then analyze whether Akerman may properly assert a retaining lien on the documents sought by the subpoena.

---

[37] *Id.* ¶¶ 2–4, 35–40; Reply ¶ 13.

[38] Reply ¶ 4; *see also* Mot. ¶¶ 28–29, 40.

[39] Opp'n ¶¶ 4–9; Tr. 19–20, 30–31, 51–52.

[40] Opp'n ¶¶ 10–15.f; Tr. 39–40, 43–44.

[41] Opp'n ¶¶ 11 n.2, 14; Tr. 30, 39–40.

[42] Opp'n ¶ 16.

### 1. The Trustee and Akerman Did Not Reach Agreement on the Scope of Akerman's Production in Response to the Subpoena

Akerman alleges that it and the Trustee entered an agreement regarding the subpoena. Akerman states that it and the Trustee disagreed on who should bear the cost of searching for and producing the documents in the subpoena.[43] Following this dispute, Akerman claims it proposed a compromise: it would bear the costs of collecting and producing the documents in exchange for the Trustee dropping its threatened motion to compel.[44]

The Trustee disagrees. She contends that there was never a "meeting of the minds" between the Trustee and Akerman that resolved their dispute. The court agrees.

"Delaware courts favor the negotiated settlement of contested legal disputes and enforces them as contracts." *E.g.*, *Delphi Petrol. Inc. v. Magella Terminal Hldgs., L.P.*, 2020 WL 1972857, at \*5 (Del. Super. Apr. 23, 2020) (citing *Schwartz v. Chase*, 2010 WL 2601608, at \*4 (Del. Ch. June 29, 2010)), *aff'd*, 251 A.3d 101 (Del. 2021). Courts will enforce settlements when the parties "agree to all material terms and intend to be bound by that contract, whether or not the contract is made in the presence of the court, and even in the absence of a writing." *Schwartz*, 2010 WL 2601608, at \*4. The party seeking

---

[43] *Id.* ¶ 6.

[44] *Id.* ¶¶ 4 (citing Exs. 10–11), 6.

to enforce an alleged agreement bears the burden of proving the existence of a contract by a preponderance of the evidence. *In re Landon Estate*, 2017 WL 2492044, at *3 (Del. Ch. June 8, 2017) (citing *Schwartz*, 2010 WL 2601608, at *4)). Here, Akerman must prove that it is more likely than not that it and the Trustee entered into a contract that the Trustee would not move to compel if Akerman ran the search terms she requested and produced documents containing those terms. *Brady v. Huber*, 2023 WL 3736371, at *4 (Del. Ch. May 31, 2023) (citing *Del. Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002)). Akerman has not met its burden.

"'Under Delaware law, overt manifestation of assent—not subjective intent—controls the formation of a contract.'" *Goode v. Goode*, 2025 WL 3204047, at *9 (Del. Nov. 17, 2025) (ORDER) (quoting *Eagle Force Hldgs., LLC v. Campbell*, 235 A.3d 727, 734 (Del. 2020)). "Whether both of the parties manifested an intent to be bound 'is to be determined objectively based upon their expressed words and deeds as manifested at the time rather than by their after the fact professed subjective intent.'" *Black Horse Cap., LP v. Xstelos Hldgs. Inc.*, 2014 WL 5025926, at *12 (Del. Ch. Sep. 30, 2014) (quoting *Debbs v. Berman*, 1986 WL 1243, at *7 (Del. Ch. Jan. 29, 1986)); *Eagle Force*, 235 A.3d at 734–35.

Akerman contends that the Trustee's March 13 letter and Akerman's March 21 production constitute an offer and acceptance of this purported

agreement.[45]  The March 13 letter is not an offer to settle, nor does it provide terms for an agreement—it is a letter from the Trustee requesting a supplemental production in response to the subpoena.  There is no language in the letter showing the Trustee proposed the terms Akerman presents in its opposition.  As best the court can determine, Akerman infers that the words "[t]o prevent me from filing a motion to compel" manifest the Trustee's intent to settle the dispute.[46]  Rule 37 permits a party to move to compel compliance with a subpoena.  To my eye, this statement was not an offer to compromise, rather it was a statement of the Trustee's potential remedies if Akerman did not produce the records she requested.

Alternatively, Akerman points to its February 24 letter to supply the bargained-for terms.[47]  Akerman's letter was an explicit offer to compromise, and that it would "make the responsive productions outlined above, without enforcing its payment rights[.]"[48]  Again, there is no indication from the Trustee's March 13 letter that she was accepting an offer and intending to conclude the parties' dispute.  The Trustee's language indicates her belief that Akerman was not complying with its obligations under the subpoena—not that

---

[45] *Id.* ¶ 4 (citing Exs. 10–11).

[46] *Id.* Ex. 10 at 4.

[47] Tr. 33 ("But there was a February 24 exchange . . . in which I specifically said, just tell use the search terms and the date ranges, and if they're reasonable, I'll do what you're asking.").

[48] Opp'n Ex. 8 at 2.

she was willing to "settle" the dispute if Akerman sent a supplemental production.[49] The record does not objectively indicate the Trustee's intent to be bound by the terms Akerman presents to the court. The court finds that the parties did not settle their dispute over the scope of Akerman's response to the subpoena.

### 2. Akerman's Retaining Lien Must Give Way to the Trustee's Need for the Elevatus Client File In Order to Discharge Her Court-Imposed Duties

Having determined that Akerman and the Trustee did not settle the issue, I now discuss whether the court should uphold Akerman's assertion of its lien. The Trustee contends that Akerman must turn over files subject to its lien because such documents are "necessary . . . to ascertain [Elevatus]'s assets and liabilities" and their value.[50] To make her case, the Trustee relies heavily on this court's decision in *Judy v. Preferred Communication Systems*.[51] Akerman disputes this, asserting that the relief the Trustee seeks is not supported by *Judy*.[52] Instead, Akerman counters, it already produced documents analogous to those sought in *Judy*, and it should be compensated for any additional production.[53]

---

[49] *See id.* Ex. 10 at 3.

[50] Mot. ¶ 38.

[51] 29 A.3d 248 (Del. Ch. 2011).

[52] *See* Opp'n ¶¶ 10–14.

[53] *Id.* ¶¶ 12–14.

"An attorney's retaining lien is the right of an attorney to detain possession of [their] client's property acquired in the course of rendering professional services." *Eagle Poultry Co., Inc. v. Camden Fire Ins. Ass'n*, 1963 WL 64648, at *1 (Del. Ch. July 18, 1963). "The lien extends to 'documents, money, or other property in [the attorney's] possession belonging to his client which [the attorney] acquired in the course of his professional relationship.'" *Judy*, 29 A.3d at 252 (quoting *Royal Ins. Co. v. Simon*, 174 A. 444, 446 (Del. Ch. 1934)). "'Retaining liens are widely accepted in the United States, and have been compared to mechanic's or artisan's liens. Lawyers are merely afforded the same advantage enjoyed by workmen who labor on behalf of others.'" *Id.* (quoting *Bennett v. NSR, Inc.*, 553 N.E.2d 881, 882 (Ind. Ct. App. 1990)).

But "[t]he right of an attorney to assert a retaining lien and inconvenience his former client by keeping his file contrasts sharply with the ethical obligations of an attorney to provide the former client with his file and act reasonably to protect the interests of the former client." *Id.* at 254. The Delaware Lawyers' Rule of Professional Conduct requires that when representation ends "a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as . . . surrendering papers and property to which the client is entitled . . . ." Del. Lawyers' R. Prof'l Conduct 1.16(d). Comment 9 elaborates that "a lawyer *must* take all reasonable steps to

– 13 –

mitigate the consequences to the client" and "*may* retain papers as security for a fee only to the extent permitted by law." *Id.* cmt. 9 (emphasis added).

The retaining lien may also impact the effective administration of justice, and "[t]he conflict between the withdrawn attorney and the former client should not be allowed to delay the underlying action." *Judy*, 29 A.3d at 255 (quoting *Lucky-Goldstar Int'l (Am.), Inc. v. Int'l Mfg. Sales Co., Inc.*, 636 F. Supp. 1059, 1063 (N.D. Ill. 1986)). The court, however, must be mindful not to "interfere unnecessarily in the dispute between the lawyer and client." *Lucky-Goldstar*, 636 F. Supp. at 1063. To determine whether a retaining lien should be respected, the court engages in "a fact-specific balancing of interests" to determine "when and to what degree an attorney's retaining lien should be respected." *Judy*, 29 A.3d at 257. The court considers six factors:

1. The client's and counsel's respective financial situations;

2. The client's sophistication dealing with lawyers;

3. Whether the disputed fee is reasonable;

4. Whether the client clearly agreed to pay the amount owed;

5. Whether the lien would prejudice the client or other interested parties; and

6. Whether there are less stringent means by which the matter can be resolved or which the outstanding fees can be secured.

*See id.* at 256–61. After engaging in this balancing test, the court may consider "the competing interests of the attorney, the client, and the judicial system, determine whether the lien should be enforced in whole or part, and evaluate whether the partial or complete release of the lien should be conditioned on the client providing alternative security." *Id.* at 257. I consider each of these factors next.

### a. Elevatus' and Akerman's Financial Situations

According to the Trustee, Elevatus may be effectively insolvent. At oral argument, the Trustee stated that "[b]ased upon the [Elevatus] bank accounts that I have access to and the information I've seen, I do not, at least with respect to cash, have the ability to either reimburse Akerman for its fees or for the cost of the search of the documents requested or to bring its balance current."[54] Akerman does not disclose its financial situation, arguing instead that Elevatus' equity holders (McAllister and Stidham) may have funds available to pay for Akerman's representation of Elevatus.[55] It also argues it did not receive any "actual representation that [Elevatus] really is insolvent."[56]

---

[54] Tr. 21. Trustee also contends that "Akerman may carry some responsibility for Elevatus' apparent insolvency." Reply ¶ 18. I reserve discussion of this issue for the crafting the remedy and do not consider it here.

[55] Tr. 41; Opp'n ¶ 15.a. *But see* Jon Campisi, *Akerman Posts Record $627M Revenue in 2025*, THE AMERICAN LAWYER (Jan. 29, 2026), https://www.law.com/americanlawyer/2026/01/29/akerman-posts-record-627m-revenue-in-2025.

[56] Tr. 41; Opp'n ¶ 15.a.

The court must balance the respective financial positions of the client and counsel. Elevatus—not its members or managers—was Akerman's client. Members and managers are not normally responsible for the debts and obligations of an LLC. 6 *Del. C.* § 18-303(a). Akerman is owed $161,036.87, but the Trustee represents that she lacks the funds, through Elevatus, to pay what is owed.[57] This factor favors the Trustee.

### b. Elevatus' Sophistication Dealing With Lawyers

Both Akerman and the Trustee agree that Elevatus, through McAllister and Stidham, was sophisticated in engaging and dealing with lawyers.[58] This factor favors Akerman.

### c. Akerman's Fee is Reasonable; and

### d. Elevatus Agreed to Pay the Amount Owed

Akerman says Elevatus owes $161,036.87 in unpaid legal fees and expenses, which it contends are reasonable.[59] The Trustee asserts that this is questionable because "there are concerns about the legitimacy of some of the work Akerman performed" for Elevatus.[60] Several invoices reflect work involving the transfer of assets to other entities at Stidham's sole direction.[61]

---

[57] Tr. 21.

[58] Mot. ¶ 37; Opp'n ¶ 15.b.; Reply ¶ 18.

[59] Opp'n ¶ 14.

[60] Reply ¶ 18.

[61] *See* Mot. ¶¶ 21–25.

– 16 –

At oral argument, the Trustee reasoned that "there is strong potential . . . the fee is disputed" and this weighed against finding a clear agreement by Elevatus to pay the full amount of Akerman's fee.[62]

Akerman counters that its engagement letter with Elevatus was reviewed and signed by attorneys who "know how billing rates work, there were no billing objections, and [Elevatus] failed to pay over a long period[.]"[63]

The Trustee's arguments are based in speculation. Akerman's assertion that an attorney reviewed and signed its engagement letter and that Elevatus did not object to the fees is the stronger argument. These factors favor Akerman.

### e. Upholding the Lien Would Prejudice the Trustee's Work to Liquidate Elevatus

This factor examines whether "imposition of the retaining lien would prejudice important rights or interests of the client or other parties." *Judy*, 29 A.3d at 260. If "the resulting inconvenience [from the lien] is disproportionate or unfairly prejudicial" to the former client or other interested parties, the lien should be overridden. *See id.* (citing *Lucky-Goldstar*, 636 F. Supp. at 1062–64).

The Trustee contends that the documents Akerman is withholding are "critical to [her] ability to ascertain what assets and liabilities are in the entity"

---

[62] Tr. 23.

[63] Opp'n ¶ 15.c.

as required by the Dissolution Order.[64]  Further, the Trustee alleges that "Akerman may be the only entity with possession of the documents" she seeks.[65]  Akerman counters that the only parties impacted by its lien are Elevatus and itself.[66]  Because the Trustee has alleged that the lien would impact her ability to carry out this court's order and Akerman has not disputed her argument, this factor favors the Trustee.

### f.    Requiring the Trustee to Post a Secured Bond Is Not An Available, Less-Stringent Means to Resolve the Parties' Dispute

"The attorney's interest protected by the retaining lien is a pecuniary interest in payment.  Courts now commonly resolve the competing interests of attorney, client, and judicial system by requiring the production of the case file conditioned on the client posting alternative security to protect the lawyer's pecuniary interest." *Judy*, 29 A.3d at 261 (collecting cases).  This factor "predominantly turns on whether the posting of security can protect adequately the attorney's pecuniary interest and, if so, what form and amount of security is warranted." *Id.*

---

[64] Tr. 24; Dkt. 68. *See also* Mot. ¶ 37; Reply ¶ 18.

[65] Reply ¶ 18.  *See also* Mot. ¶ 37 (alleging McAllister is not in possession of the records).

[66] Opp'n ¶ 15.d.

The Trustee argues there are no less stringent ways to resolve the Motion other than dissolving the lien.[67] Akerman disputes this, asserting that there "obviously are less stringent ways" to resolve the Motion.[68] To support its contention, Akerman points to the court's holding in *Judy*, which resolved the lien by requiring the former client to post a secured bond. 29 A.2d at 261.

"Different factual scenarios will affect whether the posting of security provides a solution." *Id.* Those factors could include the financial pressures facing each party, whether the dispute can be promptly resolved on the merits, and the agreed-upon fee arrangement. *See id.* The Trustee represents that Elevatus has no assets in any bank account she has seen that would enable her to satisfy the lien.[69] This weighs heavily in the Trustee's favor because "the retaining lien may have little practical value" because the Trustee cannot pay. *Id.* (citing *New World Mktg. Corp. v. Garcia*, 76 B.R. 68, 69 (E.D. Pa. 1987)).

\*　　　\*　　　\*

After considering the six factors, I conclude that Akerman's retaining lien should be overridden. Based on the record before the court, I find that it is unlikely Elevatus, through the Trustee, will be able to pay what it owes Akerman. The value of the retaining lien to Akerman, therefore, appears to be

---

[67] Reply ¶ 18; Mot. ¶ 37.

[68] Opp'n ¶ 15.f.

[69] Tr. 21

– 19 –

minimal.  The prejudice to the Trustee in carrying out her court-ordered duties if the court upholds the lien outweighs the prejudice to Akerman.

## C. The Trustee and Akerman Must Meet and Confer Regarding Next Steps

Having concluded that Akerman's retaining lien over the Elevatus client file must give way to the Trustee's need for the Elevatus file in order to discharge her court-imposed duties, I direct the Trustee and Akerman to meet and confer on how to implement this ruling.  At oral argument, when I asked the Trustee what sort of order she was seeking, and what additional work she contends Akerman must do if I rule in her favor, the Trustee stated that it would be appropriate for the parties to meet and confer on the form of order if the court resolved the retaining lien issue in her favor.[70]  Akerman, in turn, said it had "no idea what order [the court is] being asked to enter against [Akerman]."[71]  So, having the Trustee and Akerman meet and confer is an appropriate next step to clarify the Trustee's and Akerman's positions as to what should happen next absent the retaining lien.[72]  I direct the Trustee and

---

[70] *See id.* 28, 48–49.

[71] *Id.* 51; *see also id.* 29 ("We have no idea what on earth the [Trustee] wants over and above what I've already provided.").

[72] I note that the Trustee does not appear to be asking Akerman to turn over the entire Elevatus client file, even though that would seem to be an expected result of invalidating Akerman's retaining lien; instead, the Trustee seeks a subset of documents from the Elevatus client file, which she wants Akerman to undertake the burden of searching for, reviewing, and producing to her, at no cost to her or Elevatus.  *See* Mot. ¶¶ 15–19, 28–29, 38, 40; Opp'n ¶¶ 2–5, 8; Tr. 24–25, 50.

Akerman to complete that meet and confer and submit a proposed implementing order or a status report to the court.

## D. The Trustee's Request for Fees and Costs is Denied

The Trustee requests an award of attorney fees and expenses incurred in bringing the Motion.[73] The request is governed by Court of Chancery Rule 37, which states that the court "shall" require the party "whose conduct necessitated the motion" to pay the moving party's "reasonable expenses incurred in obtaining the order, including the attorney's fees, unless the Court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust." Ct. Ch. R. 37(a)(4)(A). "Rule 37 will not be invoked where a party provides reasonable justification for non-production of documents." *Beck v. Atl. Coast PLC*, 868 A.2d 840, 855 (Del. Ch. 2005).[74] Opposition to discovery is "substantially justified" if "the motion raised an issue about which reasonable people could genuinely differ on whether a party was bound to comply[.]" 8B WRIGHT & MILLER'S FED. PRAC. & PROC. § 2288 (3d ed. 2025) (discussing Fed. R. Civ. P. 37(a)(5)).[75] Delaware

---

[73] Mot. at 14; Reply ¶¶ 19–20.

[74] As the court has explained, Rule 37 "does not shift expenses as a sanction in the same sense as Rule 11 or an award under the bad faith exception to the American Rule." *Foley v. Session Corp.*, 345 A.3d 537, 562 (Del. Ch. 2025). Instead, it "calls for presumptive expense shifting to force parties to internalize the costs of their discovery positions which should reduce the number of discovery disputes." *Id.*

[75] *See also Van De Walle v. Unimation, Inc.*, 1984 WL 8270, at *4 (Del. Ch. Oct. 15, 1984) (citing an earlier version of this section of the Wright & Miller treatise).

law has not defined the outer limits of "other circumstances mak[ing] an award of expenses unjust," but the language imbues the court with broad discretion to consider the circumstances surrounding the discovery dispute.[76]

Applied these principles here, I find that it would unjust and inequitable to saddle Akerman with the Trustee's fees and expenses for the Motion, for three reasons. First, the Motion raised an issue—the viability of Akerman's retaining lien—on which reasonable people could genuinely differ given the limited decisional authority in Delaware on the issue,[77] even if, for the reasons I have explained, the Trustee's need for the Elevatus client file ultimately outweighs Akerman's need to enforce its lien. Second, Akerman did not try to use its retaining lien to block all access to the Elevatus client file. Instead, Akerman worked with the Trustee to search for and produce documents from the Elevatus client file, the Motion coming only after the Trustee and Akerman reached an impasse on the Trustee's request for Akerman to spend additional

---

[76] *See In re NVF Co. Litig.*, 1990 WL 100801, at *3 (Del. Ch. July 18, 1990) (quoting Ct. Ch. R. 37(d)); *Mellado v. APC Parent Inc.*, 2024 WL 41034, at *2 (Del. Ch. Feb. 8, 2024); *Pharmerica Long Term Care Inc. v. New Castle RX, LLC*, 2010 WL 5130746, at *3 (Del. Ch. Dec. 8, 2010); *Christen v. Trados Inc.*, 2008 WL 5255817, at *2 (Del. Ch. Dec. 12, 2008).

[77] The court is aware of only two Delaware cases citing *Judy v. Preferred Communication Systems* since the opinion's 2011 publication, and in neither of those cases was it necessary to consider and apply the six-factor test discussed by the court in *Judy*. *See TCV VI, L.P. v. TradingScreen Inc.*, 2017 WL 11590772, at *1 (Del. Ch. Dec. 21, 2017) (ORDER) (noting that the law firm "has not asserted a lien"); *In the Matter of Estate of Mock*, 2012 WL 8415852, at *5 (Del. Ch. Feb. 27, 2012) (citing *Judy* solely to acknowledge "the proposition that attorneys can obtain liens against clients for unpaid past services").

time and resources searching for documents within the Elevatus client file.[78]

Third, Akerman has suffered a significant financial loss from Elevatus' failure to pay its bill. I find it would be inequitable to order Akerman to pay the Trustee's fees and costs incurred for the Motion.

## III. CONCLUSION

For the reasons explained above, Akerman's retaining lien over the Elevatus file must give way to the Trustee's need for the Elevatus file in order to discharge her court-ordered duties. Akerman and the Trustee must meet and confer and submit a proposed implementing order or a status report to the court regarding next steps. The Trustee's request for her fees and expenses incurred in bringing the Motion is denied.

This is a Report under Court of Chancery Rule 144(b)(1). Under Court of Chancery Rule 144(c)(2)(A), exceptions to this ruling are stayed pending issuance of a final report in this case.

---

[78] *See, e.g.*, Tr. 39–40; Mot. ¶¶ 15, 19, 27–29; Mot. Ex. C; Opp'n ¶¶ 2–8; Opp'n Exs. 1–2, 6–12.